Slip Op. 06-166

# UNITED STATES COURT OF INTERNATIONAL TRADE

NATIONAL FISHERIES INSTITUTE,
INC., ET AL.,

Plaintiffs,

v.

UNITED STATES BUREAU OF
CUSTOMS AND BORDER
PROTECTION,

Defendant.

Before: Timothy C. Stanceu, Judge

Court No. 05-00683

<u>PUBLIC</u>

## <u>OPINION</u>

[Granting in part and denying in part plaintiffs' motion for preliminary injunction relief]

Dated: November 13, 2006

*Steptoe & Johnson LLP* (*Eric C. Emerson*, *Gregory S. McCue* and *Michael A. Pass*) for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); *Chi S. Choy*, Bureau of Customs and Border Protection, United States Department of Homeland Security, of counsel, for defendant.

Stanceu, Judge:  Plaintiffs National Fisheries Institute, Inc. ("NFI"), a non-profit trade association, and 27 of its members move, pursuant to USCIT Rules 7 and 65, for an order entering a preliminary injunction against United States Customs and Border Protection ("Customs" or the "Agency").  *Pls.' Mot. for Prelim. Inj.*, attached *Order* at 1; *First Am. Compl.* Attach. 1.  Plaintiffs are commercial importers of seafood products, including shrimp products that are subject to six antidumping duty orders issued by the International Trade Administration, United States Department of Commerce ("Commerce").  *First Am. Compl.* at 1, 19-22.  Plaintiffs

seek a preliminary injunction essentially to preclude Customs, during the pendency of this case, from applying a particular Customs directive, as amended in 2004 and clarified in 2005, when determining the sufficiency of each plaintiff's basic importation and entry bond. *See Pls.' Mot. for Prelim. Inj.* at 2-3. Plaintiffs, who challenge on the merits the individual bond sufficiency determinations by Customs, also request in their preliminary injunction motion that the court enjoin Customs from considering potential antidumping and countervailing duty liability in determining bond sufficiency and that Customs be directed by the court to allow replacement of any bond used to enter merchandise on or after the date of filing of *Plaintiffs' Motion for Preliminary Injunction* with a superseding bond calculated without regard to antidumping or countervailing duty liabilities. *Id.* at 1; *Mot. to Amend Injunctive Relief Requested* at 2-3.

As required by the customs laws and regulations, a basic importation and entry bond allows Customs to make a monetary demand on the surety that issued the bond should the importer of record (*i.e.*, the "principal" on the bond) fail to meet its legal obligation to "pay duties, taxes, and charges" or fail to comply with another obligation (*i.e.*, a "bond condition") guaranteed by the bond. *See* 19 C.F.R. § 113.62 (2005). An importer breaching a bond condition typically will incur contractual liability to Customs in the form of liquidated damages that may not exceed the limit of liability of the bond, and also will incur contractual liability to indemnify the surety. *See id.* Commercial importers, such as the plaintiffs in this case, typically obtain "continuous" bonds (also referred to as "term" bonds), which cover liabilities resulting from multiple import transactions over a period of time, such as one year. *See id.* § 113.12(b). For commercial importers who conduct frequent import transactions, continuous bonds typically

are more practical and economical than "single entry" bonds, which cover the obligations arising from one entry. *See id.* § 113.12(a).

To date, Customs has applied the amendment and the clarification of its bond directive only to importers of shrimp products covered by the six antidumping duty orders. The amendment and the clarification of the bond directive have had the effect of increasing substantially the limits of liability for the continuous bonds that Customs has demanded of the individual plaintiffs. *See Pls.' Mot. for Prelim. Inj.* at 2-3. The member-importers seeking injunctive relief are Admiralty Island Fisheries, Inc., d.b.a. "Aqua Star" ("Aqua Star"); Berdex Seafood, Inc. ("Berdex Seafood"); Censea Inc.; Crystal Cove Seafood Corp.; Eastern Fish Company, Inc. ("Eastern Fish"); Harbor Seafood, Inc.; Icicle Seafoods, Inc.; International Gourmet Fisheries, Inc., d.b.a. "Mid Pacific Seafoods" ("IGF"); Interocean Inc.; L.N. White & Co., Inc.; Mazzetta Company, LLC; McRoberts Sales Co., Inc.; Mseafood Corporation; Newport International; Ocean Cuisine International; Ocean to Ocean Seafood, LLC; Ore-Cal Corp. ("Ore-Cal"); Oriental Foods, Inc. ("Oriental Foods"); Pacific Seafood Group; Red Chamber Co. ("Red Chamber"); Sea Port Products Corporation; Sea Snack Foods Inc.; Southwind Foods LLC, d.b.a. "Great American Seafood Imports Co."; Tampa Bay Fisheries, Inc. ("Tampa Bay"); Thai Royal Frozen Foods Co., Inc.; The Seafood Exchange of Florida; and The Talon Group LLC. *See First Am. Compl.* Attach. 1.

Plaintiffs claim that the application of the amendment and the clarification of the bond directive are causing and will continue to cause them substantial economic harm because of the obligation to post large amounts of collateral with the surety to satisfy the current and impending bond sufficiency determinations by Customs, which plaintiffs consider to be excessive. *See Pls.'*

*Mot. for Prelim. Inj.* at 2-5; *Mem. of P. & A. in Supp. of Pls.' Mot. for Prelim. Inj.* at 15 ("*Pls.' Mem.*"). Plaintiffs argue that the decision of Customs to require continuous bonds sufficient to cover potential antidumping or countervailing duty liability exceeds the Agency's authority under 19 U.S.C. § 1623(a) (2000). *See Pls.' Mot. for Prelim. Inj.* at 5-6; *Pls.' Mem.* at 40-44. They further claim that the selective application of the amendment and the clarification by Customs to shrimp importers is arbitrary and capricious. *See Pls.' Mot. for Prelim. Inj.* at 6; *Pls.' Mem.* at 39-40, 47-50. Plaintiffs maintain that in weighing whether or not to grant the requested injunctive relief, the balance of the hardships and the public interest favor NFI and its members. *See Pls.' Mem* at 50-52.

Defendant contends that plaintiffs' alleged economic hardships "do not rise to the severe level necessary to establish immediate irreparable harm" sufficient to warrant a preliminary injunction. *Def.'s Opp'n to NFI's Mot. For Prelim. Inj.* at 7 ("*Def.'s Opp'n*"). Defendant argues that a preliminary injunction should not be ordered because, in its view, plaintiffs have not established a likelihood of success on the merits. *See id.* at 7-8, 12-23. Defendant submits that because 19 U.S.C. § 1623 grants the Agency "broad authority to protect the revenue by requiring bonds or other security as Customs 'may deem necessary,'" Customs acted reasonably and within its statutory authority when it increased the continuous bond requirements for importers of shrimp. *Id.* at 15 (quoting 19 U.S.C. § 1623(a)). Defendant further submits that "the specter of harm faced by the Government is very real and acute" if Customs is not allowed to protect the revenue of the United States through increased bonding, and that this potential harm outweighs the hardships alleged by the plaintiffs. *Id.* at 24-25. Defendant also argues that the public interest favors the protection of the revenue through resort to continuous bonds of the size

Customs determines to be necessary under the amendment and the clarification of the bond directive. *See id.*

During a hearing held at the United States Court of International Trade on March 30 and March 31, 2006, representatives of eight plaintiffs, specifically, Eastern Fish, Ore-Cal, Red Chamber and affiliates IGF and Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star, testified in support of the claim that plaintiffs will suffer immediate, irreparable harm absent injunctive relief. On April 5, 2006, a representative from Customs testified to the hardship that Customs will suffer in protecting the potential revenue and in collecting outstanding antidumping duties from shrimp importers if Customs is prevented from applying the new bond formulas.

The court's decision on plaintiffs' motion for preliminary injunctive relief is based on a review of the evidence introduced at the hearing; the transcripts of the oral argument held on April 7, 2006; plaintiffs' motion to amend its request for preliminary injunction relief filed on April 14, 2006; post-hearing briefs submitted by the parties on May 5, 2006; plaintiffs' unopposed motions to amend the *de novo* hearing record to admit limited additional evidence, filed on May 5, 2006 and July 31, 2006; and other relevant papers and proceedings in this case. The court concludes that plaintiffs have not established their entitlement to the particular injunctive relief sought in their amended motion. The court, however, further concludes that limited injunctive relief is appropriate.

The court held an in-chambers conference on July 19, 2006, during which the court discussed with the parties the reasons that the court would not grant the specific preliminary injunction sought by plaintiffs, the court's conclusion that only the eight plaintiffs that presented evidence at the hearing could satisfy the requirement of showing irreparable harm, and the

court's view that plaintiffs' showing of likelihood of success on the merits does not support

plaintiffs' request to permit plaintiffs "to replace any bond used to enter merchandise on or after

February 23, 2006, with a bond calculated without regard to potential antidumping or

countervailing duties." *Mot. to Amend Injunctive Relief Requested*, attached *Order* at 3. As

discussed in Section II.A.3 of this opinion, such relief is more akin to the restoration of a form of

*status quo ante*, rather than a preliminary injunction to preserve the *status quo*, because it would

require the court to order the cancellation of bonds, thereby extinguishing all obligations under

such bonds, and would require Customs to approve the replacement of such bonds with

superseding bonds with lower limits of liability. During the July 19, 2006 conference, the court

attempted to facilitate an amicable resolution of the preliminary injunction issue by informing the

parties of the court's preliminary conclusions, by reviewing the language of a limited draft

injunction prepared by the court, and by soliciting from the parties suggested modifications to the

draft that could achieve an administrable preliminary injunction. At that conference, the parties

requested a period of time to consult and to seek agreement on language for a preliminary

injunction to which all parties could consent. The court initially granted the parties a period of

one week to consult. The plaintiffs subsequently requested, and the court granted, additional

time for plaintiffs to continue their consultations with defendant.

In response to a USCIT R. 16 letter from the court dated August 17, 2006, defendant filed

status reports on August 17 and September 1, 2006, and plaintiffs filed a status report on

August 21, 2006, each advising the court of various matters. Of particular importance was that

the communications in the status reports indicated to the court that the parties had reached an

impasse in their negotiations concerning the preliminary injunction. Plaintiffs' August 21, 2006

status report conveyed plaintiffs' desire to continue negotiations, but interpreted defendant's August 17, 2006 status report as signaling that negotiations were at an end. Believing that negotiations had concluded, plaintiffs' August 21, 2006 status report requested that the court issue a preliminary injunction. Plaintiffs proposed a substantial change to the draft order prepared by the court, requesting that the injunction require Customs to permit any plaintiff "who obtained a new continuous entry bond on or after February 23, 2006 . . . to change the limit of liability in the new bond" without applying the amendment or the clarification of the bond directive. *Pls.' Status Report* at 2. Defendant's status reports informed the court that defendant continued to oppose any preliminary injunction but also informed the court that Customs currently did not plan to alter the bond requirements for any of the eight plaintiffs that attempted to demonstrate immediate irreparable harm. *Def.'s Status Report* at 1, Aug. 17, 2006; *Def.'s Status Report* at 1-2, Sept. 1, 2006.

Defendant submitted another status report on October 25, 2006, informing the court that Customs had published the previous day a Federal Register notice concerning bond requirements for importers of certain merchandise subject to antidumping and countervailing duty orders. The notice, described later in this opinion, announced changes to the process used to determine bond amounts for importers of Special Category merchandise. Because the notice addressed matters relevant to the situations of the individual plaintiffs, the court held two status conferences with the parties, on October 26 and November 3, 2006. In the second status conference, counsel for defendant informed the court that Customs did not intend to use the process announced in the notice to replace with superseding bonds any of the bonds already required pursuant to the amendment and the clarification, including those bonds under which plaintiffs currently are

importing merchandise.  The court held another status conference on November 13, 2006, before issuing this opinion.

Based on all proceedings held to date, the court will enter a limited preliminary injunction that generally will preserve the *status quo* with respect to the bond status of the eight plaintiffs identified above.  Each of those eight plaintiffs established that it will suffer immediate, irreparable harm, including a serious impairment of its ability to conduct its shrimp importing business, absent a preservation of the *status quo* during the pendency of this case.  Plaintiffs demonstrated that they likely will succeed, partially, on the merits in establishing that the balance of the hardships on all parties in this action tips in favor of plaintiffs and that the public interest would be better served if the court grants injunctive relief.  The court concludes that the showing made on behalf of the remaining 19 plaintiffs is insufficient to establish that those plaintiffs will suffer immediate, irreparable harm absent a preliminary injunction.

## I.  Background

Bond Directive 99-3510-004 (the "Bond Directive"), originally issued by Customs on July 23, 1991, established guidelines under which port directors are to assess the adequacy of an importer's continuous bond.  *See Monetary Guidelines for Setting Bond Amounts*, Customs Directive 99-3510-004 (July 23, 1991), *available at* http://cbp.gov/linkhandler/cgov/toolbox/legal/directives/3510-004.ctt/3510-004.txt.  Prior to the amendment by Customs in 2004, the Bond Directive set a non-discretionary, minimum continuous bond amount at $50,000 and established a formula by which "the bond limit of liability amount shall be fixed in multiples of $10,000 [or $100,000] nearest to 10 percent of duties, taxes and fees paid by the importer or broker acting as importer of record during the

calender year preceding the date of the [bond] application." *Id.* (setting forth formulas under "Activity 1 - Importer or Broker - Continuous"). Whether the bond limit was fixed in multiples of $10,000 or $100,000 depended upon whether the total duty and tax liability for an importer during the calender year preceding its bond application exceeded $1,000,000. *Id.*

Customs, on July 9, 2004, posted on its website the amendment to the Bond Directive at issue in this case (the "Amendment"), which set forth new formulas for calculating minimum continuous bond amounts for importers of agricultural/aquacultural merchandise that is subject to antidumping or countervailing duty orders. *See Amendment to Bond Directive 99-3510-004 for Certain Merchandise Subject to Antidumping/Countervailing Duty Cases* (July 9, 2004), *available at* http://www.cbp.gov/xp/cgov/import/add_cvd/bonds/07082004.xml ("*Amendment*"). Customs cited an "increasing concern regarding the collection of antidumping and countervailing duties, the impact of these collections on the amount of disbursements pursuant to the Continued Dumping and Subsidy Offset Act [of 2000, Pub. L. 106-387 ("Byrd Amendment")] . . . , and continued vigilance by [Customs] to ensure collection of all appropriate antidumping and countervailing duties." *Id.* Customs listed under-collections of antidumping duty liabilities for imports of fresh garlic and crawfish from China as examples of why it deemed it necessary to change the formula for determining minimum bond requirements. *Id.* The Amendment was neither published in the Federal Register nor subjected to the established notice and comment procedures provided for under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (2000). Customs did not publish the Amendment in the Customs Bulletin.

The Amendment requires all Customs port directors "to review continuous bonds for importers who import agriculture/aquaculture merchandise subject to antidumping/

countervailing duty cases and obtain larger bonds where necessary." *Id.* A formula contained in the Amendment directs that "in fixing the limit of liability amount," port directors will calculate the product of an importer's antidumping or countervailing duty rate and the value of merchandise subject to antidumping or countervailing duties imported by that importer during the previous year. *Id.* (setting forth the formula as the "[Commerce] rate at Order [multiplied by the] value of imports of merchandise subject to the case by the importer during the previous year"). The Amendment also applies to provisional measures by providing that "[i]f, at any time after [Commerce] issues a preliminary affirmative determination in an agriculture/aquaculture case, [Customs] detects sudden changes in declared values, claimed country of origin, or declared classification, etc., [Customs] will consider such changes to reflect an increased risk." *Id.* The Amendment, in that event, requires port directors to determine the amount of a continuous bond by calculating the product of the importer's deposit rate in effect on the date of entry and the value of merchandise imported during the previous year. *See Amendment* (setting forth the formula as the "[Commerce] deposit rate in effect on date of entry [multiplied by the] value of imports of merchandise subject to the case by the importer during the previous year"). For importers with no prior history of importing agricultural/aquacultural merchandise, the Amendment directs that a sufficient bond amount will be determined by calculating the product of the importer's cash deposit rate in effect on the date of entry and the "estimated annual import value" of the subject imports. *Id.* (setting forth the formula as the "[Commerce] deposit rate in effect on date of entry [multiplied by the] estimated annual import value of the goods subject to the case").

On January 24, 2005, Customs posted on its website a document entitled "Current Bond Formulas," which contained, *inter alia*, the formulas described in the Amendment. *Current Bond Formulas* (Jan. 24, 2005), *available at* http://www.cbp.gov/xp/cgov/import/communications_to_trade/pilot_program/ ("*Current Bond Formulas*"). The document, which was not published in the Federal Register or Customs Bulletin, also states that a "new comprehensive [Customs] Directive will be issued at a later date." *Id.*

On August 10, 2005, Customs posted on its website a clarification to the Amendment of the Bond Directive (the "Clarification"), which established two classes of merchandise, "Special Categories" and "Covered Cases." *See Clarification to July 9, 2004 Amended Monetary Guidelines for Setting Bond Amounts for Special Categories of Merchandise Subject to Antidumping and/or Countervailing Duty Cases* (Aug. 10, 2005), *available at* http://www.cbp.gov/xp/cgov/import/add_cvd/bonds/07082004.xml ("*Clarification*"). The Clarification was not published in the Federal Register or the Customs Bulletin and was not the subject of a notice and comment proceeding. According to the Clarification, "Special Categories of merchandise can be designated where additional bond requirements in the form of greater continuous entry bonds or other security, may be required." *Id.* The Clarification designates only agricultural/aquacultural merchandise as a Special Category. *Id.* The Clarification explains that "[t]he term Covered Cases refers to merchandise within a previously designated Special Category where different standards or formulas for determining the bond amount will be applied." *Id.* Antidumping and countervailing duty investigations and orders pertaining to shrimp are the only Covered Cases that Customs has designated as falling within the

agriculture/aquaculture Special Category.  *See id.*  The Clarification sets forth criteria that

Customs is to consider in determining whether imports designated as Special Categories or

Covered Cases should be subject to increased bond requirements.  *See id.*[1]  The Clarification also

establishes the procedure for "notice, timing and appeal" of increased bond demands made by

Customs for importers of Special Category and Covered Cases merchandise.  *See Clarification*.

Because Customs confined its "Covered Cases" designation to shrimp subject to

antidumping or countervailing duty proceedings, only importers of certain frozen warmwater

shrimp from Brazil, China, Ecuador, India, Thailand and Vietnam, as specified in the scope of

the six antidumping duty orders ("subject shrimp"), are subject to the new bond requirements set

forth by Customs in the Amendment and the Clarification.  Commerce issued amended

antidumping duty orders on certain frozen warmwater shrimp from those six countries on

February 1, 2005.  *See Pls.' Mem.* Ex. 4.  Subsequently, Customs issued to all 27 plaintiffs letters

advising, pursuant to 19 C.F.R. Part 113, that their continuous bonds have been deemed

"insufficient to protect the revenue and insure compliance with [Customs] laws and regulations."

*See Pls.' Mem.* Ex. 5 Attach. B, Ex. 6 Attach. B, Ex. 7 Attach. A, Ex. 8 Attach. B, Ex. 9

Attach. C, Ex. 10 Attach. B.  The notices of insufficiency established, for each importer, new

continuous bond limits of liability and stated that in determining such limits, Customs applied

---

[1]  The Clarification lists the following criteria: "1. Previous collection problems concerning a specific case or industry involved; 2. The similarity to previous cases or industries experiencing uncollected revenue problems; 3. Whether the merchandise in question had very low duty rates or was duty-free prior to initiation of an antidumping or countervailing duty case; 4. The projected ability of the industry to pay future duty liabilities; 5. Low capitalization of the industry involved such that new or increased duty liabilities create increased risk; 6. Whether the industry involved is highly leveraged such that new or increased duty liabilities create increased risk; [and] 7. Any other factors that are deemed relevant."

the formula described as "AD/CVD Order (3)," *i.e.*, the "[Commerce] Order rate [multiplied by the] value of imports of merchandise subject to the case by the importer" during the previous year. *See id.*; *Current Bond Formulas* (setting forth the formula under "AD/CVD Order (3)").

On October 24, 2006, Customs published a Federal Register notice (the "Notice") "to provide additional information on the process used to determine bond amounts for importations involving elevated collection risks and to seek public comment on that process." *Monetary Guidelines for Setting Bond Amounts for Importations Subject to Enhanced Bonding Requirements*, 71 Fed. Reg. 62,276, 62,276 (Oct. 24, 2006) ("*Notice*"). The Notice announces changes to the process discussed in the Amendment and the Clarification and, although inviting public comment, makes the changes in the process effective upon publication. *Id.* (stating that "[t]he process published in this Notice is in effect."). The Notice retains the same basic formulas for calculating limits of liability for the continuous bonds required of importers of merchandise in Special Categories. *Id.* at 62,277. The Notice announces, however, that Customs will provide for public notice and comment on the designation of new Special Categories, which it announces will occur according to specified criteria, and also will provide for public notice of the removal of a designation. *Id.*

The Notice does not announce that Customs is changing the current designation of aquaculture merchandise as a Special Category or the current designation of the shrimp antidumping orders as Covered Cases, but it indicates that Customs no longer will designate Covered Cases. "[Customs] will continue to evaluate on an industry wide basis those types of merchandise where additional bond requirements may be needed." *Id.* "However, because importers are only affected when merchandise is subject to different bond requirements,

[Customs] will only designate Special Categories, that is, merchandise for which an enhanced bond amount may be required." *Id*. The Notice states, further, that importers of Special Category merchandise "will be offered the opportunity to submit information on their financial condition related to the risk of non-collection for that importer and [Customs] will determine bond amounts based on that information, the importer's compliance history and other relevant information available to [Customs]." *Id*. The Notice indicates, however, that absent exceptional circumstances, Customs will apply the formulas to determine the bond amounts where a submission has not been made by a principal in response to a notice from Customs of a new bond requirement. *Id*.

The Notice announces a new procedure that will apply when an importer of Special Category merchandise makes a submission in response to a notice from Customs of a new bond requirement. The new procedure provides the principal with 30 days to respond and to provide evidence supporting a lower bond amount, including financial information relevant to the importer's ability to pay, such as financial statements and tax returns. *Id*. at 62,278. The Notice provides that Customs will consider this information along with the factors identified in the applicable Customs regulation, 19 C.F.R. § 113.13(b), in determining a new bond requirement. *Id*. This new bond requirement "will not take effect with respect to a principal until 14 days after the date of [Customs'] reply to the principal's response." *Id*. The Notice indicates that Customs intends to exercise discretion in setting new bond amounts. "If [Customs] determines that the principal has a record of compliance with customs laws and regulations and that the principal has demonstrated an ability to pay, [Customs] may decide not to require an increased bond amount even though the principal imports Special Category merchandise." *Id*. The Notice, however,

also states that "[a]t any time after [Customs] determines a bond amount for a principal below that provided by the formula, if the principal fails to remain compliant with customs laws and regulations, [Customs] will recalculate the principal's bond amount in accordance with the formulas outlined in this notice." *Id.*

After the issuance of the six antidumping duty orders on subject shrimp, plaintiffs were required to obtain new continuous bonds that secured the amount of liability demanded by Customs. Some of the 27 plaintiffs were unable to secure continuous bonds in the amounts requested by Customs, and as a result these plaintiffs ceased their importation of some or all types of subject shrimp. *See Pls.' Mem.* at 7. Other plaintiffs were able to secure continuous bonds acceptable to Customs to cover their 2005-2006 imports of subject shrimp. The eight plaintiffs that introduced evidence, in addition to the remaining 19 NFI importers, seek injunctive relief to, *inter alia*, restrict Customs from applying the Amendment or the Clarification, or from considering any potential antidumping duty liability, in determining the sufficiency of future continuous bonds.

## II. Discussion

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1581(i). *See First Am. Compl.* ¶¶ 2-4 (asserting jurisdiction under 28 U.S.C. § 1581(i)). That provision provides the Court of International Trade with exclusive jurisdiction over any civil action commenced against the United States that arises out of any law providing for revenue for imports (subsection (i)(1)), tariffs or duties on the importation of merchandise for reasons other than the raising of revenue (subsection (i)(2)), and administration and enforcement with respect to matters referred to in subsections (i)(1) and (i)(2) (subsection (i)(4)). 28 U.S.C. §§ 1581(i)(1), (2) & (4).

"The burden is always on the movant to show entitlement to a preliminary injunction." *Reebok Int'l Ltd. v. J. Baker., Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).  In determining whether the court should employ the extraordinary remedy of a preliminary injunction, a court of equity will consider the following four factors: (1) whether the moving party will suffer immediate and irreparable injury absent relief, (2) whether there exists a likelihood of success on the merits, (3) whether the balance of hardship on all the parties favors the moving party, and (4) whether the public interest would be better served by the requested relief. *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983).  The court, in its analysis of these factors, may "weigh the factors together in a sliding scale manner." *See Chilean Nitrate Corp. v. United States*, 11 CIT 538, 539 (1987).  No one factor is dispositive. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  "[T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *Id.*  Consequently, the court need not assign equal weight to each factor. *See id.*; *see also Corus Group PLC v. Bush*, 26 CIT 937, 942, 217 F. Supp. 2d 1347, 1354 (2002), *aff'd on other grounds*, 352 F.3d 1351 (Fed. Cir. 2003).

The court, having considered the evidence put forth by the parties and the arguments addressing the four factors that the parties made in their briefs and during oral argument, concludes that only eight of the plaintiffs - specifically, Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star - have established their entitlement to a preliminary injunction.  The showings by these eight plaintiffs as to irreparable harm and the likelihood of success on the merits, however, justifies a more limited preliminary injunction than that sought by plaintiffs.  Plaintiffs' motion and draft order for a preliminary injunction, as amended on April 14, 2006, seek to prohibit Customs from "relying upon or

otherwise considering" the Amendment, the Clarification, or "any potential antidumping or countervailing duty liability on any imported product, when determining the sufficiency of the continuous entry bond for any entry made on or after February 23, 2006," for the 27 plaintiff-importers. *Mot. to Amend Injunctive Relief Requested*, attached *Order* at 1-2. The motion and draft order also seek an order directing Customs to "permit any of the foregoing named companies to replace any bond used to enter merchandise on or after February 23, 2006, with a bond calculated without regard to potential antidumping or countervailing duties." *Id.* at 3. As discussed in this opinion, the court declines to impose the specific remedy sought by plaintiffs. The court, however, will order a limited preliminary injunction that preserves generally the *status quo* with respect to the bond status of these eight plaintiffs during the pendency of these proceedings.

## A.  Immediate and Irreparable Harm

To meet their burden of establishing immediate and irreparable harm, "plaintiff[s] must prove that unless the injunction is awarded, some harm will result to [them] that cannot be reasonably redressed in a court of law." *Am. Customs Brokers Co. v. U.S. Customs Service*, 10 CIT 385, 386, 637 F. Supp. 218, 220 (1986). "Only a viable *threat of serious harm which cannot be undone* authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Zenith Radio Corp.*, 710 F.2d at 809 (citation and internal quotation marks omitted).

To prevail on a motion for preliminary injunction, plaintiffs have the burden of producing "probative evidence" to demonstrate a threat of immediate, irreparable harm. *See Nat'l Hand Tool Corp. v. United States*, 14 CIT 61, 66 (1990). "Failure of [a plaintiff] to bear its burden of

persuasion on irreparable harm is ground to deny a preliminary injunction." *Bomont Indus. v. United States,* 10 CIT 431, 437, 638 F. Supp. 1334, 1340 (1986).  However, there is no bright line test for determining whether a plaintiff will suffer irreparable harm.  *Corus Group PLC*, 26 CIT at 943, 217 F. Supp. 2d at 1354.  A plaintiff can satisfy its burden by showing that it will be forced into bankruptcy absent an injunction.  *See Queen's Flowers de Columbia v. United States*, 20 CIT 1122, 1125, 947 F. Supp. 503, 506 (1996).  Less drastic harm, however, also can satisfy the burden.  *See, e.g.*, *Nat'l Juice Prods. Ass'n v. United States*, 10 CIT 48, 54, 628 F. Supp. 978, 984 (1986) (finding that severe disruption to a company's business operations is sufficient to establish irreparable injury); *718 Fifth Ave. Corp. v. United States*, 7 CIT 195, 198 (1984) (stating that "[b]usiness disruption resulting from administrative delay could be sufficient to demonstrate irreparable harm"); *Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 242, 566 F. Supp. 1523, 1527 (1983) (finding that "the real prospect for lost future orders, the lost benefits from its past advertising, substantial expenditures for marketing and promotional efforts, and the loss of plaintiff's reputation in the trade and with the consuming public are significant actual and potential injuries which warrant the extraordinary relief of a preliminary injunction").

### 1.  Contentions of the Parties on Immediate and Irreparable Harm

Plaintiffs allege that absent the requested preliminary injunctive relief, they will continue to suffer immediate, irreparable harm that includes alteration of their buying activities, damage to their long-standing relationships with their customers and suppliers, and loss of sales and business opportunities.  *See Post-Hearing Br. in Supp. of Pls.' Mot. for Prelim. Inj.* at 19-28 ("*Pls.' Post-Hearing Br.*").  According to plaintiffs, such harm results from the need to obtain

continuous bonds, pursuant to insufficiency notices issued by Customs to plaintiffs, in the excessive amounts calculated by Customs using the bond formulas indicated by the Amendment and the Clarification. *See id.* at 16-17. The excessive bond amounts, plaintiffs contend, are causing sureties to require, as a condition of issuing a bond, a letter of credit in the amount of the bond. *Id.* at 31-32. Plaintiffs further contend that obtaining these letters of credit hinders plaintiffs' ability to finance their businesses efficiently. In this regard, plaintiffs describe a scenario they refer to as "stacking," arguing that, absent preliminary injunctive relief, their credit will remain encumbered until final liquidation of all entries covered by the new continuous bonds, and that, as time goes on, plaintiffs will remain liable under multiple bonds at the same time. *See id.* at 16-17. Plaintiffs contend that the continuous and increasing burdens on their credit availability will impede severely the operation of their businesses and ultimately will force them out of the business of importing shrimp. *See id.* at 17-18. Although plaintiffs presented testimony from representatives of, and documentary evidence concerning, only eight of the 27 importers who filed jointly the *Complaint* and *Amended Complaint* in this action, plaintiffs argue that the court "should make reasonable inferences as to the irreparable harm that will befall the entire group of NFI [i]mporters" if the requested relief is not granted. *Id.* at 35.

Defendant argues that none of the plaintiffs has met its burden of establishing the level of economic harm necessary to warrant the extraordinary remedy of injunctive relief. *See Def.'s Opp'n* 9-12; *Def.'s Post-Hearing Br. in Opp'n to NFI's Mot. for Prelim. Inj.* 10-15 ("*Def.'s Post Hearing Br.*"). Defendant contends specifically that audited financial records, which were provided by two plaintiffs, fail to establish adequate irreparable harm as to those two plaintiffs, and that any findings of fact drawn from those financial statements for purposes of inferring

irreparable harm cannot be extrapolated to the remaining plaintiffs. Tr. 851-868; *see Def.'s Post-Hearing Br.* at 12. Further, defendant claims that plaintiffs' arguments relating to lost business opportunities are speculative and indicate only that "the losing bidder was in a weaker financial position than its competitor." *Def.'s Opp'n* at 12. Defendant also maintains that the administrative record establishes that the overall volume of shrimp imports has declined by only 2.6 percent since importers, including plaintiffs, were required to obtain larger bonds and that, despite the testimony of plaintiffs, the shrimp importing industry as a whole is not suffering extraordinary harm. *See id.* at 10; *Def.'s Post-Hearing Br.* at 5; *Def.'s Opp'n* at *Decl. of Bruce W. Ingalls* Attach. B. According to defendant, "one plaintiff's lost business probably ended up in the hands of a different importer of the same product – like in any low margin, commodity industry with a large number of competitors." *Def.'s Opp'n* at 10. Finally, defendant maintains that plaintiffs' "stacking" argument is also mere speculation because "plaintiffs have provided no evidence that insurers intend to require additional collateral for future years." *Id.* at 5; *see Def.'s Post-Hearing Br.* at 4-5.

## 2. Findings of Fact on Immediate and Irreparable Harm

To establish that NFI and its members will suffer immediate, irreparable harm absent injunctive relief, eight plaintiffs - Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star - submitted testimonial and documentary evidence. Through such evidence, plaintiffs sought to demonstrate that all 27 plaintiffs will incur harm if Customs is not preliminarily enjoined from applying the Amendment in determining the sufficiency of plaintiffs' continuous bonds. Based on a preponderance of the evidence presented at trial, the court finds as facts that each of the above-named eight plaintiffs will incur serious,

immediate and irreparable harm absent some form of preliminary injunctive relief. Specifically, this harm is the foreseeable result of the cumulative effects of obtaining the additional collateralized letters of credit necessary to secure future continuous bonds in amounts determined pursuant to the new bond requirements of the Amendment and the Clarification. At this time, the court lacks sufficient evidence to make factual findings that would justify preliminary injunctive relief on the basis of immediate and irreparable harm to the remaining 19 plaintiffs. The evidence supporting the findings of fact relevant to whether the eight plaintiffs will suffer immediate and irreparable harm absent injunctive relief is summarized below.

a. Company-Specific Findings of Fact

i. Eastern Fish

Plaintiffs introduced at trial the testimony of Mr. Eric Howard Bloom, President of Eastern Fish. The court found his testimony credible based on his demeanor, demonstrated knowledge of Eastern Fish's business activities, and general knowledge of the business of importing shrimp. His testimony established, by a preponderance of the evidence, the following facts:

1. Eastern Fish, established in 1972, is engaged in the business of importing seafood products, [


]

2. [

]

3.     [

]

4.     [

]

5.     [

]

6.      [




                                ]

7.      [










                                                    ]

ii.  Ore-Cal

Plaintiffs introduced at trial the testimony of Mr. Mark Daniel Shinbane, Vice-President

of Ore-Cal.  The court found his testimony credible based on his demeanor, demonstrated

knowledge of Ore-Cal's business activities, and general knowledge of the business of importing

shrimp.  His testimony established, by a preponderance of the evidence, the following facts:

8.      Ore-Cal, for the last 45 years, has engaged in the business of importing shrimp into the
        United States.  Tr. 193.  [



                                ]

9.      [

]

10. [

]

11. [

]

12. [

]

13.   [

]

### iii.  Red Chamber, IGF, and Tampa Bay

Plaintiffs introduced at trial the testimony of Mr. Richard V. Martin, General Manager of IGF and Executive Consultant to Red Chamber, a company that is affiliated through common ownership with plaintiffs IGF and Tampa Bay.  The court found his testimony credible based on his demeanor, demonstrated knowledge of Red Chamber's, IGF's and Tampa Bay's business activities, and general knowledge of the business of importing shrimp.  His testimony established, by a preponderance of the evidence, the following facts:

14.   Red Chamber, IGF, and Tampa Bay are affiliated through common ownership.  Tr. 267.
      [

]

15.   [

]

16.     [



        ]

17.     [






        ]

18.     [






                              ]

19.     [




              ]

20.     [

]

21.    [




]

### iv.  Berdex Seafood

Plaintiffs introduced at trial the testimony of Mr. Donelson S. Berger, President of Berdex Seafood.  The court found his testimony credible based on his demeanor, demonstrated knowledge of Berdex Seafood's business activities, and general knowledge of the business of importing shrimp.  His testimony established, by a preponderance of the evidence, the following facts:

22.    Berdex Seafood is engaged in the business of importing seafood into the United States [

]

23.    [




]

24.    [

]

25.    [

]

26.    [

]

### v.  Oriental Foods

Plaintiffs introduced at trial the testimony of Dr. G.V. Reddy, President of Oriental Foods.  The court found his testimony credible based on his demeanor, demonstrated knowledge of Oriental Foods' business activities, and general knowledge of the business of importing shrimp.  His testimony established, by a preponderance of the evidence, the following facts:

27.  Since 1979, Oriental Foods has engaged in the business of importing seafood products. Tr. 486.  [

                        ]

28.  [

                ]

29.  [

                        ]

30.  [

                                ]

### vi.  Aqua Star

Plaintiffs introduced at trial the testimony of Mr. Robert Hooey, Senior Executive Vice President of Aqua Star.  The court found his testimony credible based on his demeanor, demonstrated knowledge of Aqua Star's business activities, and general knowledge of the business of importing shrimp.  His testimony established, by a preponderance of the evidence, the following facts:

31.     Aqua Star is engaged in the business of importing seafood, [

]

32.     [

]

33.     [

]

34.   [

]

### b.  Summary of Findings of Fact

Through testimony, Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star have established that they encountered difficulties in obtaining new bonds in the increased amounts demanded by Customs.  *See Findings of Fact* ¶¶ 3-5, 7, 9-10, 13, 15-18, 23-25, 28-29, 32.  The difficulties resulted from the need to provide their financial institutions with collateralized letters of credit in amounts that, in most instances, significantly burden plaintiffs' asset-based credit lines.  *See Findings of Fact* ¶¶ 1, 4, 8, 10, 14, 17-18, 22, 24, 29, 32, 34; *see also Pls.' Mem.* at 15; *Pls.' Post-Hearing Br.* at 8-9.  Because plaintiffs "rely heavily on their lines of credit to conduct their business[es]," Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star all reduced their on-hand inventories and declined to pursue tangible business opportunities.  *Pls.' Post-Hearing Br.* at 8.  In some instances, plaintiffs dropped product lines or scaled back existing or planned product lines.  *See Findings of Fact* ¶¶ 5, 13, 16-17, 20-21, 25-26, 30, 33; *Pls.' Post-Hearing Br.* at 4-5.  Effects on cash flow resulting from posting collateral to secure irrevocable letters of credit led some plaintiffs to forgo opportunities to supply, develop, and market new

products. *See Findings of Fact* ¶¶ 5, 13, 20-21, 25-26, 30, 33.  In several instances, some

plaintiffs lost spot sales and declined to bid on major orders from supermarket chains and major

retail customers because of the restrictions associated with the new bond requirements. *See*

*Findings of Fact* ¶¶ 5, 25, 30, 34.  In other instances, some plaintiffs were forced to import

shrimp on a delivered duty-paid basis, which reduces profit margins. *See Findings of Fact* ¶¶ 4,

30, 32-33.  For a period spanning 2005 and 2006, one of the plaintiffs was unable to secure a

sufficient bond and temporarily was forced out of the importing business. *See Findings of Fact*

¶ 32.

The difficulties associated with obtaining sufficient continuous bonds also affect

customer and supplier relationships of the eight plaintiffs.  The evidence demonstrates that these

plaintiffs declined opportunities to pursue business with existing companies and suppliers.

Impediments to the ability to import shrimp on a continuous basis and the transition to importing

on a delivered duty-paid basis affect plaintiffs' long-standing relationships with customers, who

depend upon plaintiffs for supply, and with suppliers, who dedicate a portion of their production

for purchase by plaintiffs. *See Findings of Fact* ¶¶ 6, 13, 20, 24-25, 30, 33-34.  Some plaintiffs,

in order to fulfill certain contracts with customers, must import shrimp from certain countries

that are subject to the antidumping duty orders on shrimp, namely India, Thailand, and Vietnam.

*See Findings of Fact* ¶¶ 2, 11-12, 20, 26, 33.  These plaintiffs considered shrimp products from

certain other countries to be unsuitable substitutes for shrimp from India, Thailand, and Vietnam

because suppliers in those other countries, according to these plaintiffs, do not have the

infrastructure or sanitary standards necessary to become reliable alternative suppliers. *See*

*Findings of Fact* ¶¶ 2, 11, 20, 33.

The liabilities that are secured by plaintiffs' current bonds will extend until liquidation of all entries is final. The date on which final liquidation of those entries will occur is not known. The letters of credit supporting plaintiffs' current bonds will not be extinguished until after final liquidation. If Customs continues to apply the new bond formulas in calculating future bond demands, plaintiffs likely will suffer an additional reduction to their borrowing capacities as a result of securing new letters of credit. Two of the eight plaintiffs that introduced evidence have already suffered such an additional reduction in their borrowing capacities in order to secure new bonds that were issued in the spring of 2006. Such new letters of credit, the liability of which will not be extinguished until some future date, will further deplete plaintiffs' credit and cause plaintiffs significant economic harm. The court finds as a fact that another round of bond demands likely will cause plaintiffs severe irreparable harm, especially in view of the requirement on an importer, imposed by 19 C.F.R. § 113.12(b)(1), to notify Customs of any material changes in importing activities. The court further observes that bond determinations affecting the eight plaintiffs will occur as bonds expire over the next several months, some as early as December 2006. *See Findings of Fact*. Some plaintiffs have testified that such a burden on available credit may lead to additional drastic changes in business operations, including the importation of shrimp and other products on a delivered duty-paid basis. Such changes will lead to additional inefficiencies and, ultimately, reduced profit margins, lost sales, and severed relationships with customers and suppliers. Others have testified that additional reductions in borrowing capacity may restrict them from operating their businesses altogether.

3.  Conclusions of Law on Immediate and Irreparable Harm Applicable to the Eight Plaintiffs

Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star have established, through probative testimony of their representatives and other probative documentary evidence that, absent a preliminary injunction that preserves generally the *status quo*, they will suffer the type of extraordinary harm that seriously threatens the continued operation of their shrimp importing businesses.  Their respective showings satisfy the requirements for preliminary injunctive relief.  With respect to all eight of these plaintiffs, the harm that will occur absent a *status quo* preliminary injunction includes severe disruption of the plaintiffs' business activities, damage to the plaintiffs' long-standing relationships with their customers and suppliers, lost sales, diminished profits, and foregoing of business opportunities. *See Am. Customs Brokers Co.*, 10 CIT at 387, 637 F. Supp. 2d at 221 (finding irreparable injury where plaintiff provided "evidence of substantial harm to business good will, business reputation and a significant loss of new business.").  The court concludes that some form of a preliminary injunction is the only way to protect the plaintiffs from future irreparable injury during the pendency of this case.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

The situation of three of the eight plaintiff-importers differs from that of the other five plaintiff-importers in a significant respect.  These three plaintiffs are constrained, in whole or in part, from importing shrimp subject to the antidumping duty orders pursuant to side agreements that they entered into with Customs in order to obtain affordable continuous bonds.  They are, in this respect, suffering a different type of harm than that afflicting the other five plaintiff-importers who introduced evidence of harm.  As a direct result of the side agreements, these three importers are experiencing a substantial interference with or preclusion of their ability to

conduct their shrimp importing businesses. For these three plaintiffs, a preservation of the *status quo* through a preliminary injunction would allow these conditions to remain in place despite the demonstrated harm that the conditions imposed in the side agreements are causing. Moreover, as discussed later in this opinion with respect to the showing of likelihood of success on the merits, these three importers are likely to be able to show that the imposition of the conditions was contrary to the Customs regulations. For this reason, the preliminary injunctive relief that the court will order prohibits the enforcement of the side agreements and the associated restraints on importation of subject merchandise during the pendency of this proceeding.

The harm being suffered by the other five plaintiff-importers that introduced evidence results from the high limits of liability associated with their basic importer's bonds. The court concludes, based on the evidence these five plaintiffs have introduced, that the impending harm will be a direct result of the cumulative burdens occurring as a result of the application of the bond formulas set forth in the Amendment, the Current Bond Formulas, and the Clarification to the next determinations of bond sufficiency. Each of these five plaintiffs will suffer adverse effects from the encumbering of additional credit when they are required to obtain future continuous bonds in amounts calculated pursuant to the new bond formulas required under the Amendment and the Clarification while they remain under the obligations of the continuous bonds Customs already assessed pursuant to those formulas. Two of these five plaintiff-importers received from Customs a second round of insufficiency notices in the spring of 2006 and have been required to encumber additional credit in order to obtain the new bonds, a development the court has considered in reaching its conclusions concerning irreparable harm.

The court concludes that while a limited preliminary injunction that generally preserves the *status quo* is appropriate at this time, the evidence introduced thus far does not establish that the current level of harm being experienced by these five plaintiffs is so disruptive as to qualify them for a preliminary injunction that restores a form of *status quo ante*, *i.e.*, a preliminary injunction that directs Customs to replace the current bonds with bonds based on the same limits of liability as those in place prior to the application of the Amendment and the Clarification. The court recognizes, additionally, that the situations of one or more of these five plaintiffs, or one or more of the other testifying plaintiffs, may change, and may change rapidly, in a way that could necessitate a modification of the preliminary injunction. The court, therefore, will consider motions to modify the preliminary injunction and may order expedited hearings, if necessary.

The court notes the cumulative effects of two successive rounds of bond determinations based on the rigid application of the formulas, and the upcoming third round of bond determinations that will occur over the next several months. The burden imposed by an importer's outstanding letters of credit, which resulted from the application of the formula with little or no adjustment during the previous rounds of bond determinations, affects negatively the financial condition of that importer. The adverse effects will continue and are all but certain to become exacerbated upon the next round of bond determinations, during which the effect of the letters of credit, by weakening the plaintiff-importer's financial condition, may compromise the ability of that plaintiff-importer to qualify for a lower bond determination. The court, for these reasons, is ordering defendant to begin, immediately, a review of the five continuous bonds that have a limit of liability at or above $1.5 million under which these five plaintiffs currently are importing. The court is ordering Customs to review these five continuous bonds so that Customs

determines expeditiously, on its own, whether those bonds should be canceled in favor of superseding bonds with lower limits of liability, and so that Customs reports to the court, within 60 days from the date of the Order imposing the preliminary injunction, its conclusions and explains to the court the reasons for those conclusions.

Defendant argues that plaintiffs have not been able to show sufficient injury to their current respective financial conditions to warrant a preliminary injunction. Although plaintiffs have not shown irreparable harm sufficient to qualify for a preliminary injunction restoring a form of *status quo ante,* they have shown sufficient irreparable harm to justify relief that generally preserves the *status quo*. *See* Tr. 749-751, 896-898 (discussing plaintiffs' request for the *status quo*). Defendant's arguments that relate to whether or not the lost business opportunities, declining profit margins, and decreases in volume of shrimp imports are sufficient to establish irreparable harm that already has occurred, are therefore not on point. To establish irreparable harm, plaintiffs "must show a *presently existing threat* and not just the mere possibility of injury." *NSK Ltd. v. United States*, 28 CIT ___, ___, 350 F. Supp. 2d 1128, 1132 (2004) (emphasis added); *see Zenith Radio Corp.*, 710 F.2d at 809; *Elkem Metals Co. v. United States*, 25 CIT 186, 192, 135 F. Supp. 2d 1324, 1331 (2001). Irreparable harm constitutes *potential harm* that cannot be redressed by a legal or an equitable remedy at the conclusion of the proceedings, so that a preliminary injunction is the only way of protecting the plaintiffs. *See Weinberger*, 456 U.S. at 312-318.

Defendant urges the court to conclude that plaintiffs' argument that the "insurers intend to require additional collateral for future years" is pure speculation. *Def.'s Opp'n* at 5. Based on the facts established by the administrative record, *i.e.*, that each surety required an irrevocable

letter of credit from plaintiffs who obtained new continuous bonds in 2005 and 2006, the court

infers that there is a strong likelihood that sureties similarly will require additional collateral in

the future.  The facts established on the *de novo* record also support the inference that sureties

will require up to 100 percent security for any new or extended continuous bonds, as they have to

date.  Specifically, the testimony of witnesses for two plaintiffs relating to the requirements

imposed on plaintiffs seeking new term bonds corroborates the finding that sureties typically

require 100 percent collateral in the situations occasioned by the new bonding requirements.  The

record also establishes that lending institutions typically reduce credit limits by amounts equal to,

or nearly equal to, the amount of a letter of credit used to secure a bond.  *See Findings of Fact*

¶¶ 3, 7, 9-10, 18, 24.  Moreover, the requirement that plaintiffs must inform Customs of any

material changes in the bond applications, such as whether "the value or nature of the

merchandise to be imported will change in any material respect during the next year," further

supports the inference that if plaintiffs exceed the import capacities on their existing term bonds,

Customs, absent a preliminary injunction, will require additional bonding pursuant to the

formulas set forth in the Amendment and the Clarification.  19 C.F.R. § 113.12(b)(1)(ii).

Plaintiffs have demonstrated that to secure such additional bonding, plaintiffs' sureties are

requiring that the bonds be fully collateralized, which in turn requires plaintiffs to further

encumber the credit available from their lending institutions.  In view of these demonstrated facts

and the strong likelihood of cumulating harm, the court considers the review of current bond

limits that it is ordering Customs to conduct to be necessary and appropriate.

In its status reports to the court, filed on August 17 and September 1, 2006, defendant

informed the court that "Customs and Border Protection ("CBP") currently does not plan to alter

the bond requirements for any of the eight plaintiffs that attempted to demonstrate immediate

irreparable harm" and that "CBP does not currently intend to render insufficient the bonds of the

three of those eight importers whose current bonds are subject to restrictions upon subject

shrimp, should those plaintiffs import subject shrimp." *Def.'s Status Report* at 1-2, Aug. 17,

2006; *Def.'s Status Report* at 1, Sept. 1, 2006. Because of this lack of current intention, among

other reasons, defendant submits that a preliminary injunction is not warranted. *Def.'s Status*

*Report* at 1-2, Aug. 17, 2006; *Def.'s Status Report* at 2, Sept. 1, 2006. The court does not agree

that this representation by defendant is sufficient to preclude the need for a preliminary

injunction at this time. The current intention of Customs, absent a preliminary injunction, can

change at any time and, without notice to plaintiffs or the court, result immediately in additional

burden and disruption to one or more of the eight plaintiffs who presented evidence of irreparable

harm. In addition, the aforementioned expiration of term bonds, some of which bonds will

expire as early as December 2006, makes the future serious harm even more imminent. The

assurance from defendant that Customs does not intend to render insufficient any current bonds

of the eight plaintiffs does not address this imminent harm. The court can prevent that harm

during the pendency of this proceeding only by enjoining Customs from applying the

Amendment, the Current Bond Formulas, and the Clarification to the next determinations of

limits of liability, which will occur upon the expiration of the current term bonds of the eight

plaintiffs.

#### 4.  The Court Will Not Infer that the Remaining 19 Plaintiffs Have Met Their Burden of Establishing Immediate, Irreparable Harm

The court will not infer that the remaining 19 plaintiffs will suffer the same type of harm established by Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star.  The only facts that the court can infer with respect to the remaining plaintiffs are listed in the *Joint Stipulation of Undisputed Facts* filed on March 30, 2006, which are insufficient to establish that those plaintiffs' current financial conditions, lending relationships, or business operations are threatened with irreparable harm.  However, the court will consider another motion by any of these remaining plaintiffs for a preliminary injunction or for a hearing at which evidence of immediate, irreparable harm could be introduced.

### B.  Likelihood of Success on the Merits

To prevail on a motion for injunctive relief, plaintiffs carry the burden of establishing a likelihood of success on the merits.  *FMC Corp.*, 3 F.3d at 427; *Zenith Radio Corp.*, 710 F.2d at 809.  Plaintiffs have demonstrated a strong likelihood that they will succeed, in part, on the merits of this action.

Plaintiffs brought this action under 28 U.S.C. § 1581(i) to challenge the application of the Amendment and the Clarification in determinations by Customs of the sufficiency of continuous bonds covering plaintiffs' liabilities for import transactions, particularly those transactions involving subject shrimp.  *See First Am. Compl.* ¶ 2.  In support of their challenge, plaintiffs make several arguments.  Plaintiffs primarily argue that the interplay of 19 U.S.C. § 1623, providing for the setting of bond conditions by Customs, and of 19 U.S.C. §§ 1671, 1673, providing for the assessment of antidumping and countervailing duties by Commerce, precludes

Customs from considering potential antidumping and countervailing duty liability in determining the sufficiency of a continuous bond. *See id.* ¶¶ 24-28. Plaintiffs' second general argument is that the application of the Amendment and the Clarification to shrimp importers generally and to plaintiffs was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and was unsupported by substantial evidence. *See id.* ¶¶ 29-31.

### 1. Plaintiffs Failed to Show a Likelihood of Success for their Arguments that the Statute Precludes Customs From Considering Potential Antidumping Duty Liability in Determining the Sufficiency of a Continuous Bond

Plaintiffs' primary argument is that Customs is precluded by law from considering potential antidumping and countervailing duty liability in determining the sufficiency of a continuous bond. *See id.* ¶¶ 24-28. Plaintiffs argue, specifically, that 19 U.S.C. § 1623(a) "limits [Customs'] authority to require importers to post a bond to 'case[s] in which bond or other security is not specifically required by law.'" *Pls.' Post-Hearing Br.* at 39 (quoting 19 U.S.C. § 1623(a)). According to plaintiffs, cash deposits collected in antidumping and countervailing cases, which are provided for by statute in 19 U.S.C. §§ 1671e(a)(3), 1673e(a)(3), provide "other security" within the meaning of § 1623(a), thereby precluding Customs from requiring additional security for that purpose. *See Pls.' Mem.* at 41. Plaintiffs cite to the legislative history of § 1623(a) in support of their contention that the plain meaning of § 1623(a) confers on Customs authority to impose a bond or other security only in situations where such measures are not provided for by law. *See id.* at 41-42.

Defendant counters that Customs has full statutory authority to consider antidumping or countervailing duty liability in setting the amount of a continuous bond. *See Def.'s Post-Hearing Br.* at 16-19. Rather than limiting the authority of Customs to establish the amount of a term

bond, according to defendant, § 1623(a) confers authority upon Customs to impose bond requirements to protect the revenue, including the authority to set a continuous bond amount in the circumstances at issue in this case. *See id.* Defendant further argues that other subsections of § 1623 "demonstrate that [Customs] possesses discretionary authority to protect the revenue by requiring the posting of a bond." *Id.* at 20. Defendant specifically points to § 1623(b), stating that "'[w]henever a bond is required or authorized by a law, regulation, or instruction which . . . [Customs] is authorized to enforce, the Secretary of the Treasury *may* – (1) Except as otherwise specifically provided by law, *prescribe the conditions* and form of such bond . . . and *fix the amount of penalty* thereof.'" *Id.* (quoting 19 U.S.C. § 1623(b)).

The court concludes that plaintiffs have not met their burden of establishing a likelihood of success on the issue of whether Customs is precluded by law from considering potential antidumping or countervailing duty liability in setting the limit of liability for a continuous bond. Subsection (a) of 19 U.S.C. § 1623 provides that

> the Secretary of the Treasury may by regulation or specific instruction require, or authorize customs officers to require, such bonds or other security as he, or they, may deem necessary for the protection of the revenue or to assure compliance with any provision of law, regulation, or instruction which the Secretary of the Treasury or the Customs Service may be authorized to enforce.

19 U.S.C. § 1623(a). The subsection conditions the authority accorded to the Secretary or to Customs with the introductory phrase, "[i]n any case in which bond or other security is not specifically required by law." *Id.* Read according to its plain meaning, subsection (a) addresses the matter of *when* a bond or other security may be required. Plaintiffs would have the court construe the introductory phrase as a limitation on the authority of the Secretary and Customs to set the limit of liability of a term bond. The only language in subsection (a) that specifically

relates to the limit of liability of a term bond allows for bonds "necessary for the protection of the revenue."  Subsection (b) of § 1623 applies to various matters pertaining to bonds, regardless of whether the bond is required by statute, regulation, or instruction.  It provides that "[w]henever a bond is required or authorized by a law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce, the Secretary of the Treasury may– (1) Except as otherwise specifically provided by law . . .  fix the amount of penalty thereof, whether for the payment of liquidated damages or of a penal sum."  *Id.* § 1623(b)(1).  The statute further allows the Secretary to "[a]uthorize the execution of a term bond the conditions of which shall extend to and cover similar cases of importations over such period of time, not to exceed one year, or such longer period as he may fix when in his opinion special circumstances existing in a particular instance require such longer period."  *Id.* § 1623(b)(3).  When read together, the two subsections appear to provide Customs considerable discretion in setting the requirements for term bonds so as to protect the revenue.

In support of their argument, plaintiffs also refer to the legislative history of Section 623 of the 1930 Tariff Act (19 U.S.C. § 1623).  Plaintiffs quote a House Report that explains that

> [i]n order to provide for more uniformity in these matters [*i.e.*, matters in the tariff laws pertaining to bonds] and for more elasticity in the requirement for bonds, there is included in the bill as section 623 a provision authorizing the Secretary of the Treasury by regulations to require or to authorize collectors to require such bonds or other security as he or they [may] deem necessary for the protection of the revenue and to assure compliance with the customs laws and regulations.  A number of specific provisions of Titles III and IV requiring bonds in particular cases have been eliminated to correspond with this amendment.  *The new provision will authorize the requirement of a bond wherever not specifically required by the law*, but will not permit of the waiving of a bond where an express requirement occurs.

*Pls.' Mem.* at 42 (quoting H.R. Rep. No. 71-7, at 186 (1929)) (emphasis added in *Pls.' Mem.*).

The legislative history relied upon by plaintiffs does not support an inference that Congress intended to limit the authority of Customs in the way that plaintiffs advocate. To the contrary, in enacting Section 623, Congress appears to have endeavored to expand, not limit, the authority of Customs to provide Customs with sufficient authority to protect the revenue and to ensure compliance with the customs laws and regulations.

Plaintiffs further cite to 19 U.S.C. § 1673d(c)(1)(B)(ii) to support their argument that Congress intended to preclude Customs from considering antidumping duty liability in setting the amount of a continuous bond. *Pls.' Mem.* at 44. That statutory provision directs Commerce to "order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable." 19 U.S.C. § 1673d(c)(1)(B)(ii) (2000). The provision is directed at Commerce. The provision is silent on the question of whether Customs, under other Tariff Act provisions, specifically, under 19 U.S.C. § 1623, may require security in addition to the cash deposit if it deems such security necessary to protect the revenue. Plaintiffs, as of yet, have not pointed to a provision of the antidumping laws indicating congressional intent that cash deposits be the exclusive security available to guarantee antidumping and countervailing duty liabilities. Nor have plaintiffs put forth a convincing argument that 19 U.S.C. § 1673d(c)(1)(B)(ii) and 19 U.S.C. § 1623, when read together, preclude Customs from requiring bonding as security for any potential amount by which liquidated duties may exceed the cash deposit.

2.  Plaintiffs Established a Likelihood of Success for their Arguments Alleging That Customs'
Actions were Arbitrary, Capricious, or an Abuse of Discretion

Although plaintiffs' showing of likelihood of success on the merits falls short in some

respects, the court concludes that plaintiffs have shown that they are likely to prevail on their

argument that the actions taken by Customs in imposing on plaintiffs increased bond

requirements pursuant to the Amendment and the Clarification are arbitrary, capricious, or an

abuse of discretion and, therefore, must be set aside pursuant to what they contend is the

applicable standard of review, as provided in 5 U.S.C. § 706.[2]  Plaintiffs contend, *inter alia*, that

---

[2] Claims brought under 28 U.S.C. § 1581(i) are reviewed pursuant to § 706 of the APA, which provides for judicial review of agency action alleged to be, *inter alia*, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Specifically, 5 U.S.C. § 706 provides that

> [t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning of applicability of the terms of an agency action.  The reviewing court shall–
>> (1) compel agency action unlawfully withheld or unreasonable delayed; and
>> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
>>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>> (B) contrary to constitutional right, power, privilege, or immunity;
>>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>> (D) without observance of procedure required by law;
>>> (E) unsupported by substantial evidence in a case subject to [5 U.S.C. §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
>>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

the administrative record does not support Customs' application of the new bond requirements to shrimp importers. *See Pls.' Post-Hearing Br.* at 47-51. In response to questions of the court during the hearing on the preliminary injunction motion, plaintiffs indicated that the action by Customs constitutes a legislative rule that was adopted without appropriate notice and comment procedures. *See id.* at 45-46. Plaintiffs further argued that application of the new formulas solely to importers of shrimp "is not a reasonable response to the problem identified by [Customs]" in the Amendment or the Clarification. *Id.* at 43. Defendant argues that the actions of Customs in setting the amounts of continuous bonds are committed to agency discretion by law and therefore are not subject to the "arbitrary, capricious, or abuse of discretion" standard of review. *See Def.'s Post-Hearing Br.* at 23-26.

The court is not persuaded by defendant's argument regarding the applicability of the standard of review under the APA. Further, the court finds that plaintiffs have established a likelihood of demonstrating that Customs' selective application of the new bond formulas solely to shrimp importers and the stringent manner in which Customs applied the bond formulas to each of the eight shrimp importers who made an evidentiary showing of irreparable harm are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### a.  The "Arbitrary, Capricious" Standard of Review Applies in this Case

Defendant argues that the actions of Customs in setting the amounts of continuous bonds are committed to agency discretion by law and therefore are not subject to the "arbitrary, capricious, or abuse of discretion" standard of review. *Def.'s Post-Hearing Br.* at 23-26. Defendant's post-hearing brief posits that 5 U.S.C. § 701(a)(2), the APA provision precluding review of agency action that is committed to agency discretion, applies "'if the statute is drawn

so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* at 24 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  Defendant submits that 19 U.S.C. § 1623 provides no such meaningful standard.  *See id.* at 23.  In further reliance on *Heckler v. Chaney*, defendant maintains that judicial review of the Customs bond decisions "is limited to whether: (1) [Customs] exceeded its statutory authority; (2) there was a constitutional violation; or (3) [Customs] violated its own regulation."  *Id.*  Defendant asserts that none of these three factors is present here.  *Id.*

The court rejects defendant's arguments on the standard of review.  Plaintiffs challenge the application of the Amendment and the Clarification to shrimp importers and specifically to the individual bond determinations.  As part of their showing of a likelihood of success on the merits, plaintiffs have shown a likelihood of establishing that the bond determinations at issue properly are subjected to judicial review under an "arbitrary, capricious, or abuse of discretion" standard.  They assert that the court is granted jurisdiction over this action by 28 U.S.C. § 1581(i).  *First Am. Compl.* ¶¶ 2-4.  In a challenge to agency action brought under 28 U.S.C. § 1581(i), the court is directed by statute to "review the matter as provided in section 706 of title 5."  28 U.S.C § 2640(e) (2000).  In pertinent part, section 706 of title 5 directs a court to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2000).  Defendant would have the court decline to apply this standard of review, despite the statutory directive in 28 U.S.C. § 2640(e), based on what defendant considers to be the holding in *Heckler v. Chaney*.

Defendant's argument fails because the Supreme Court's holding in *Heckler v. Chaney* is inapplicable to the facts of this case.  *Heckler v. Chaney* presented the question of whether, under

the APA and the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), the

Food and Drug Administration's ("FDA") refusal to exercise its enforcement authority –

specifically, in that case, the FDA's decision not to exercise authority to prohibit the use by

States of drugs to carry out capital sentences by lethal injection – may be judicially reviewed.

*See Heckler*, 470 U.S. at 828 (explaining that "th[e] case turns on the important question of the

extent to which determinations by the FDA *not to exercise* its enforcement authority over the use

of drugs in interstate commerce may be judicially reviewed.  That decision in turn involves the

construction of two separate but necessarily interrelated statutes, the APA and the FDCA.").  The

holding, and the reasoning, of *Heckler v. Chaney* stem from the longstanding recognition by the

Supreme Court that an agency decision not to exercise enforcement authority is generally

unsuitable for judicial review because "an agency decision not to enforce often involves a

complicated balancing of a number of factors which are peculiarly within its expertise,"

including "whether agency resources are best spent on this violation or another, whether the

agency is likely to succeed if it acts, whether the particular enforcement action requested best fits

the agency's overall policies, and, indeed, whether the agency has enough resources to undertake

the action at all."  *Id.* at 831.  The Supreme Court based its holding in *Heckler v. Chaney* in part

on 5 U.S.C. § 701(a)(2), which disallows review of agency actions "committed to agency

discretion by law."  *See id.* at 828-33.  But the Supreme Court's analysis, and its holding in the

case, is confined to the question of whether and how a court should review an agency's refusal to

exercise its enforcement authority.  Plaintiffs' claims do not challenge any determination by

Customs not to exercise enforcement authority but involve, instead, the manner in which

Customs exercised its discretion to set the limits of liability for plaintiffs' continuous bonds

under 19 U.S.C. § 1623.  Defendant's argument glosses over this critical distinction.

The Supreme Court cautioned in *Heckler v. Chaney*, as it had in its earlier decision in

*Citizens to Preserve Overton Park v. Volpe*, that the exception to agency review created by

5 U.S.C. § 701(a)(2) is "'a very narrow exception.'"  *Id.* at 830 (quoting *Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).  "The legislative history of the Administrative

Procedure Act indicates that [the exception] is applicable in those rare instances where 'statutes

are drawn in such broad terms that in a given case there is no law to apply.'"  *Id.* (quoting S. Rep.

No. 79-752, at 26 (1945)).

The court is unable to agree with defendant that there is no law to apply in this case.

Under 19 U.S.C. § 1623(b)(3), Customs may authorize a term bond for a period of one year or

longer.  Customs has general authority under § 1623(b) to prescribe the conditions and form of a

bond, including a term bond, and to "fix the amount of penalty thereof, whether for the payment

of liquidated damages or of a penal sum."  19 U.S.C. § 1623(b)(1).  Read as a whole, § 1623

clarifies that Customs is to exercise its discretion in setting the amounts and conditions of bonds

to further the general purpose of ensuring compliance with law and regulation.  That general

purpose encompasses the more specific purpose of imposing such bond requirements as are

necessary to protect the revenue.

Defendant further asserts that Customs did not violate 19 C.F.R. § 113.13, which

regulation, in defendant's view, "does not tie the agency's hands in any way beyond the statute."

*Def.'s Post-Hearing Br.* at 29.  According to defendant, 19 C.F.R. § 113.13 is a "broadly worded

regulation" that "only provides guidelines to use in setting bond amounts," and "in no way

constricts [Customs'] authority to identify a risk to the revenue and act accordingly." *Id.*

at 29-30. Defendant also argues that the Court of Appeals for the Federal Circuit, in *Carolina*

*Tobacco Co. v. Bureau of Customs and Border Protection*, 402 F.3d 1345, 1349-50 (Fed. Cir.

2005), has rejected the notion that an importer is "entitled to an individualized bond

determination based upon each prong of section 113.13(b)." *Id.*

In its regulations, Customs implemented 19 U.S.C. § 1623 to require port directors to

make individual determinations on bonds, including continuous bonds, and to do so by applying

certain guidelines. *See Carolina Tobacco Co.*, 402 F.3d at 1349 (stating that the guidelines in

§ 113.13(b) "provide suggested standards for government officials to use in performing their

duties."). Under 19 C.F.R. § 113.13(b), the port director

> should at least consider: (1) The prior record of the principal in timely payment of
> duties, taxes, and charges with respect to the transaction(s) involving such
> payments; (2) The prior record of the principal in complying with Customs
> demands for redelivery, the obligation to hold unexamined merchandise intact,
> and other requirements relating to enforcement and administration of Customs and
> other laws and regulations; (3) The value and nature of the merchandise involved
> in the transaction(s) to be secured; (4) The degree and type of supervision that
> Customs will exercise over the transaction(s); (5) The prior record of the principal
> in honoring bond commitments, including the payment of liquidated damages;
> and (6) Any additional information contained in any application for a bond.

19 C.F.R. § 113.13(b). In *Carolina Tobacco Co.*, the Court of Appeals approved of Customs'

"regular practice . . . to set the bond at 10 percent of the importer's prior year's activity, and then

use the factors in the regulation to determine whether a higher bond is required for a particular

importer in order to protect the revenue." 402 F.3d at 1349. The Court of Appeals stated, in

*dicta*, that "[e]ven if the Section 113.13(b) regulation required some individualized consideration

by Customs of the six factors before setting the amount of the bond, Carolina has not shown that

Customs failed to give such consideration in this case." *Id.* at 1350.  The Court of Appeals

rejected the notion that a port director must consider each of the six factors in determining the

limit of liability for a continuous bond.  "In considering the factors, the port director may give

[the six factors] whatever weight he deems appropriate; he may conclude that particular factors

should be given no weight whatsover." *Id.* (citing *Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338

U.S. 604, 613 (1950)).

The court does not construe 19 C.F.R. § 113.13(b) or the holding in *Carolina Tobacco*

*Co.* to support the proposition that an importer is not entitled to an individualized bond

determination by the Customs port director that would be upheld under an "arbitrary, capricious,

or an abuse of discretion" standard of review.  Under 19 U.S.C. § 1623(b) and Customs' own

regulations, the Agency is to employ discretion, but that discretion is to be exercised according to

statutory purpose and regulatory criteria.  The discretion, therefore, is not unlimited.  *See*

*Beardmore v. Dep't of Agric.*, 761 F.2d 677, 679 (Fed. Cir. 1985) (stating that "an agency's

discretion is not unlimited, and 'reasonableness' cannot cover for arbitrary or capricious

action.").  Yet, the implication of defendant's argument is that Customs in its broad discretion

may set a bond amount that is unreasonable or that would not be sustained under an "arbitrary,

capricious, or an abuse of discretion" standard of review.  In view of the congressional directive

that the court apply that standard in reviewing the agency actions plaintiffs have challenged, the

court cannot accept defendant's constrained conception of the judicial review available to

importers in the situation in which plaintiffs have brought this case.

Relying on Article III of the Constitution, defendant also contends that "[b]ecause NFI

has not alleged that the bonding policy constitutes a 'legislative rule' subject to APA notice and

comment procedures, there is no case or controversy concerning this issue." *Def.'s Post-Hearing Br.* at 30. Finally, defendant maintains that the Amendment and the Clarification are akin to "general statements of policy" and, therefore, exempt from the APA notice and comment procedures pursuant to 5 U.S.C. § 553(b)(A). *See id.* at 32-34.

Because plaintiffs have shown a likelihood of establishing that the individual bond determinations will not survive review under an arbitrary and capricious standard, the court need not reach these issues. The court, however, doubts that the requirements of Article III could preclude plaintiffs from challenging the new bond requirements on the ground that they constitute a "legislative rule" that should have been subjected to notice and comment. Defendant contends that because the issue was not raised by plaintiffs, but rather raised by the court during oral argument, the issue is not properly before the court. *See id.* at 30. The court reads nothing in Article III or in precedent that limits a court's ability to consider arguments pertaining to the legality of agency action, in addition to those raised by the parties in their pleadings and their initial papers, so long as the court exercises proper jurisdiction over the matter challenged.

Plaintiffs challenge the new bond requirements on the basis that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *First Am. Compl.* ¶ 31. Whether the Amendment or the Clarification constitute a "legislative rule" that should have been subjected to notice and comment procedures is an issue that the court, in later ruling on the merits, could address in deciding whether the Customs action satisfies the "in accordance with law" element of the arbitrary and capricious standard of review. At that time, the court may consider evidence introduced by the testifying plaintiffs demonstrating that only those of the eight importers who promised not to import subject shrimp, or to limit such imports, were able to

negotiate a lower minimum bond amount than the bond formulas required. *Findings of Fact* ¶¶ 16-17, 24, 32. Such onerous and rigid application of the new bond formulas indicates that Customs may have applied a quasi-legislative rule, which was not subject to the prescriptions of the APA, 5 U.S.C. § 553, rather than afford the eight plaintiffs a case-by-case administrative determination as contemplated by 19 C.F.R. § 113.13. *See New Jersey v. Dep't of Health & Human Servs.*, 670 F.2d 1262, 1281 (3d Cir. 1981) ("The APA notice and comment procedures exist for good reason: to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public."); *Citizens to Save Spencer County v. U.S. EPA*, 600 F.2d 844, 876 (D.C. Cir. 1979) (noting that quasi-legislative rules are subject to 5 U.S.C. § 553). Because the bond demands appear not to have been based on such individual case-by-case determinations, plaintiffs have established that their exists a strong likelihood that Customs' determinations of continuous bond requirements for Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star were arbitrary and capricious.

The court need not decide at this time the merits of defendant's argument characterizing the Amendment and the Clarification as "general statements of policy" exempt from APA notice and comment procedures. The court nonetheless observes that the Amendment and the Clarification possibly can be read to modify the subject matter of 19 C.F.R. § 113.13. The Amendment and the Clarification establish new bonding requirements that affect the substantive rights of an entire group consisting of all or nearly all U.S. importers of shrimp.

b.  Plaintiffs Established a Likelihood of Success for their Arguments that in the Clarification, Customs Arbitrarily and Capriciously Designated the Shrimp Antidumping Duty Orders as the Only "Covered Cases"

The administrative record supports a conclusion that plaintiffs are likely to demonstrate that Customs arbitrarily and capriciously selected the antidumping duty orders on shrimp as the only "Covered Cases."  The Amendment stated three reasons why Customs must reevaluate the way it determines sufficient bond amounts: a heightened concern regarding the under-collection of antidumping and countervailing duties, the effect of such under-collection on the ability of Customs to disburse duties to the domestic industry pursuant to the Byrd Amendment, and the continued vigilance by Customs to collect all appropriate antidumping and countervailing duties from importers. *See Amendment*.  Customs, however, did not articulate in the Amendment or the Clarification a reason why antidumping duties on shrimp imports are especially susceptible to under-collection, as opposed to duties on imports of other agricultural or aquacultural products subject to antidumping duty orders, or as opposed to all products subject to such orders. *See Pls.' Mem.* at 47.  Due to the unliquidated status of entries subject to the antidumping duty orders on subject shrimp, no record exists demonstrating that significant numbers of shrimp importers are defaulting or have defaulted on any obligation to pay antidumping duties on their imports of shrimp. *See id.*  Even were there a record of under-collection of antidumping duties on shrimp imports, such a record would not serve as an explanation of why Customs has not subjected importers in the industries Customs cited in the Amendment as having established histories of under-collection, *i.e.*, importers of crawfish tail meat and garlic from China, to the bonding

formulas in the Amendment and the Clarification.[3] When asked at oral argument to explain this paradox, counsel for defendant responded, even more paradoxically, that the new bond formulas were not applied to importers in other agricultural or aquacultural industries because of "legal challenges." *See* Tr. 1059-61.

Although Customs infers that there exists a risk that the duty liability on certain shrimp imports may be subject to "large fluctuations in the dumping margins, and importers who enter and exit the importing business quickly," the administrative record does not appear to support such a finding. *Admin. R.* Ex. 1 at 2. The record does not identify evidence that the initial cash deposits of plaintiffs will be insufficient to cover the final rates of liquidation. Nor does the record identify evidence that importers of shrimp are particularly susceptible to bankruptcy, likely to go out of business, or operating as "sham" or "alter ego successor companies." *Admin. R.* Ex. 7 & Ex. 8 at 1.[4]

Other documents in the administrative record appear to lend further support to plaintiffs' future endeavor to show that the Amendment and the Clarification were imposed arbitrarily or capriciously on shrimp importers. As one example, the administrative record appears to indicate that political considerations influenced the decision by Customs to apply the new bond formulas

---

[3] According to Customs, the amounts of uncollected duties for crawfish tail meat from China for fiscal years 2003, 2004 and 2005 were $85,397,347.58, $170,053,407.56 and $32,370,446.32, respectively. The amount of uncollected duties for garlic from China for fiscal year 2004 was stated to be $24,581,557.26. *See Pls.' Mem.* at 48 & Ex. 12.

[4] The administrative record establishes that 25 current shrimp importers were participating in the Customs-Trade Partnership Against Terrorism ("C-TPAT"), which evidences a cooperative relationship between those importers and Customs in the war against terror. *Admin. R.* Ex. 6 at 3. Although participation in C-TPAT does not lend support to any finding relating to these importers' financial stability, such participation is relevant to a finding that these importers are not "fly-by-night" operations.

only to the shrimp importing industry. The document entitled "Periodic Risk Assessment of

Material Risks in the Revenue Process" explains that "the uncollected antidumping duties are

under the watchful eye and close scrutiny of the domestic industry. With a large amount of funds

unavailable for disbursement [under the Byrd Amendment] because of unpaid duty bills, the

issue also garners Congressional and media interest." *Admin. R.* Ex. 1 at 2. All of the

"uncollected duties" to which Customs refers in the administrative record, however, pertain to

imports of agricultural and aquacultural products other than shrimp.

The record shows that Customs explained why it singled out the entries subject to the

antidumping duty order on shrimp during an internal power point presentation on May 27, 2004:

> We are proposing a proactive and prospective approach for the purpose of
> reducing the potential revenue write-off exposure [( *i.e.*, uncollected duties),] that
> we have experienced in other cases recently. We have chosen shrimp as a first
> shot at this because we feel we have built a strong risk based case that provides a
> strong, defensible position for why we are taking these actions. We can can [sic]
> be sure that we will hear complaints about these actions from importers but in this
> case, for once, we can also count on support for our actions from the very parties
> that have been complaining recently, congress and domestic industry.

*Admin. R.* Ex. 8 at 8. Customs noted that the Ad Hoc Shrimp Action Committee, which is the

petitioner in the shrimp antidumping investigations and represents the interests of the domestic

industry, is comprised of shrimp producers located mainly in Alabama, Florida, Louisiana,

Mississippi, North Carolina, South Carolina and Texas. *See id.*

In a memorandum by the Deputy Commissioner of Customs entitled "Proposed Bonding

Guidelines for Agriculture/Aquaculture Antidumping and Countervailing Duty Cases," Customs

stated that

> [p]olitical and domestic interest and scrutiny of [Customs] actions in
> [antidumping and countervailing duty] collections is intense as a result of the

> Byrd Amendment which makes [antidumping and countervailing] duty collections available to domestic petitioners.  The domestic petitioners in this case are from south and southeastern states that have congressional representation on committees that include the Subcommittee on Homeland Security, International Trade, House Ways & Means, Appropriations, Small Business Affairs, and the Senate Finance Committee.  Concern has been raised about [Customs] efforts in the area of collecting [antidumping and countervailing] dut[ies], particularly from Southeast Asia, and this proposal would provide an example of our proactive efforts to address these concerns.
>
> The impact on importers may also generate inquiries and interest from their congressional representatives.  The importers are not as geographically concentrated as the domestic industry but are represented on all of the same committees.  In fact, three states that account for over 50 percent of the imports of shrimp are also the home to domestic petitioners for the case.

*Admin. R.* Ex. 14 at 3-4.  These statements appear to be relevant to a finding that Customs, rather than basing its determination to apply the new bond formulas only to importers of shrimp on facts in the administrative record demonstrating risk to the revenue particular to shrimp imports, was motivated, at least in part, by domestic political pressures to take action directed against the shrimp importing industry.  Even if such considerations were not dispositive in the decision by Customs to confine the action to shrimp importers, plaintiffs may well be able to establish on the merits that the political considerations help support a conclusion of arbitrariness and capriciousness and that "the appearance and integrity of the [agency] decision-making process would have benefited from a more formal procedure."  *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 758 (9th Cir. 1992), *reh'g denied and amended by*, 985 F.2d 1419 (9th Cir. 1993) (finding invalid an order of the Secretary of Agriculture for failure to comply with the APA).

c. Plaintiffs Established a Likelihood of Success for their Argument that the Application of the Amendment and the Clarification to Eight Individual Plaintiffs Was Arbitrary and Capricious

Based on a review of the administrative record, the court concludes that plaintiffs are likely to succeed in showing that Customs applied the Amendment and the Clarification to Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star in an arbitrary and capricious manner. Despite the flexibility granted to port directors by 19 C.F.R. § 113.13 in determining the minimum amount of a bond, the evidence put forth by these plaintiffs demonstrates that Customs, in applying the new bond requirements, did not allow for any meaningful deviation from the formulas set forth in the Amendment and maintained in the Clarification. Rather, Customs strictly applied the formulas, apparently despite the criteria in 19 C.F.R. § 113.13. The administrative record indicates that plaintiffs are likely to succeed in showing that the bond formulas were applied to these plaintiffs for the sole reason that these plaintiffs were importers of shrimp subject to antidumping duty orders.

The obligation to pay antidumping duties that would be secured by a continuous bond is limited to the amount by which the liquidated antidumping duties may exceed the cash deposits. The formulas, however, do not appear to include a factor to adjust for the required cash deposits unless it is assumed that the cash deposits represent only about half of the eventual antidumping duty liability. In response to plaintiffs' arguments, defendant has not advanced a convincing reason why the formulas do not directly take into consideration the cash deposits, which in the ordinary instance would be made by the importer of record and would reduce the amount of unsecured potential antidumping duty liability.[5]

---

[5] In the closing sentence of the Notice, Customs appears to acknowledge that the continuous bond ordinarily would serve as security only for amounts by which the cash deposit is

Each notice of bond insufficiency issued to the eight plaintiffs by Customs cites, as authority, Part 113 of the Customs regulations. *See, e.g.*, *Pls.' Mem.* Ex. 5 Attach. B, Ex. 6 Attach. B, Ex. 7 Attach. A, Ex. 8 Attach. B, Ex. 9 Attach. C, Ex. 10 Attach. B; *Joint Stipulation of Undisputed Facts* ¶¶ 8-31. As discussed above, § 113.13(b) of the Customs regulations sets forth guidelines for determining the amount of a bond. "In determining whether the amount of a bond is sufficient, the port director . . . should at least consider" factors including an importer's prior record of paying outstanding duty liabilities, an importer's prior record of complying with Customs' demands for redelivery, the degree of supervision that Customs will exercise over the subject transactions, and an importer's prior record of honoring bond commitments. 19 C.F.R. § 113.13(b). As also discussed above, the Court of Appeals for the Federal Circuit in *Carolina Tobacco Co.* stated that a port director, in reviewing the factors listed in § 113.13(b), may accord those factors "whatever weight he deems appropriate" but did not state that Customs may deny an importer an individualized bond determination or imply that Customs need not act reasonably. 402 F.3d at 1350. In determining the minimum bond amounts for Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star, the evidence supports a finding that Customs applied the formula AD/CVD Order (3) – *i.e.*, the Commerce Order rate multiplied by the value of imports of merchandise subject to the case by the importer during the previous year – without regard to each importer's individual compliance record. *See Pls.' Mem.* Ex. 5 Attach. B, Ex. 6 Attach. B, Ex. 7 Attach. A, Ex. 8 Attach. B, Ex. 9 Attach. C,

---

exceeded. *See Notice*, 71 Fed. Reg. at 62,278 ("Congress has provided CBP authority to require security in order to ensure the payment of all duties determined to be due to the United States, including any revenue collection gaps between estimated duty deposits and final assessed duties that the importer fails to satisfy."). The Notice, nevertheless, maintains the basic formulas announced in the Amendment and the Clarification.

Ex. 10 Attach. B; *Joint Stipulation of Undisputed Facts* ¶¶ 8-31; *Findings of Fact* ¶¶ 1, 4, 9, 15, 19, 23, 28, 31-32. Moreover, it appears that Customs did not consider each individual importer's financial condition or ability to pay prospective antidumping duty liabilities, but rather appeared to base the application of the formulas on one critical factor – that the importer engages in the importation of subject shrimp. *Findings of Fact* ¶¶ 1, 4, 9, 15, 19, 23, 28, 32.

Three plaintiff-importers have established a likelihood of success of prevailing in a challenge to their respective bond determinations in yet another respect. As noted above, each of these importers has been required by Customs to accept a limitation on the importation of subject shrimp, in whole or in part, as a condition of obtaining a bond allowing them to continue to import merchandise. With respect to each of the three importers, the limitation is not set forth as a bond condition but is established only in a series of e-mail communications between the plaintiff-importer and the Customs port director. *See Pls.' Mem.* Ex. 7 Attachs. B, C, & E (e-mails from Customs to each of two plaintiffs, including e-mails from Casey Horn of Customs to these importers stating that bonds will be rendered insufficient "immediately" if the importer attempts to import certain aquacultural products covered by antidumping or countervailing duty orders), Ex. 9 Attach. C (e-mails between an importer and Customs, including an e-mail from Casey Horn of Customs to the importer stating that bonds will be rendered insufficient "immediately" if the importer attempts to import certain aquacultural products covered by antidumping or countervailing duty orders). Those communications reveal a likelihood that each of the three importers were, or are likely to be, denied the benefit of the notice procedure required by 19 C.F.R. § 113.13(c), under which an importer must be provided 30 days to obtain a new continuous bond following notice by the port director that the port director has determined a

continuous bond to be inadequate "to protect the revenue and insure compliance with the law and

regulations." 19 C.F.R. § 113.13(c). Moreover, the conditions were, according to the record

evidence, imposed under a degree of duress and without citation to any statutory or regulatory

authority.[6]

### C. Balance of the Hardships

In evaluating whether to grant a motion for injunctive relief, the court must "determine

which party will suffer the greatest adverse effects as a result of the grant or denial of the

preliminary injunction." *Ugine-Savoie Imphy v. United States*, 24 CIT 1246, 1250, 121 F. Supp.

2d 684, 688 (2000). Plaintiffs and defendant each contend that the balance of hardships militates

in its respective favor.

Plaintiffs allege that "[i]f no injunctive relief is granted, and if [Customs] continues to

require bonds to cover potential antidumping duty liability on frozen shrimp, and if sureties

continue their collateral demands to issue these bonds, NFI [i]mporters will suffer grievous

---

[6] The court raised this issue during the July 19, 2006 conference. In response, Customs represented that "the Government will provide notice to the relevant party pursuant to 19 C.F.R. § 113.13(c), should [Customs] find it necessary to render insufficient any bond issued to any of the eight plaintiffs that attempted to demonstrate immediate irreparable harm." *Def.'s Status Report* at 2, Aug. 17, 2006. While committing Customs to providing notice, defendant simultaneously asserts that "pursuant to 19 C.F.R. § 113.13(d), no notice to the principal is required for additional security if the agency believes there [*sic*] the revenue is in jeopardy." *Id.* at 3. Subsection (d) of § 113.13, however, does not allow Customs to dispense with the 30-day notice when rendering a continuous bond insufficient. The regulations state that "[n]otwithstanding the provisions of this section or any other provision of this chapter, if a port director or drawback office believes that acceptance of *a transaction* secured by a continuous bond would place the revenue in jeopardy or otherwise hamper the enforcement of Customs laws or regulations, he shall require additional security." 19 C.F.R. § 113.13(d) (emphasis added). Section 113.13(d) grants to port directors the discretion to review an individual transaction to determine whether that transaction poses a risk to the revenue, *i.e.*, a port director must make the determination on an entry-by-entry basis. Nothing in 19 C.F.R. § 113.13(d) authorizes Customs to eliminate the 30-day notice requirement of § 113.13(c).

irreparable harm. By contrast, if the injunction is granted, [Customs] will suffer none." *Pls.'* *Mem.* at 50-51. According to plaintiffs, Customs will not suffer harm because plaintiffs are required to post cash deposits when entering subject shrimp into the United States for consumption. *Pls.' Mem.* at 51; *see Pls.' Post-Hearing Br.* at 54-56. These cash deposits provide Customs with the type of security "that Congress intended for imports under antidumping and countervailing duty orders." *Pls.' Mem.* at 51. Plaintiffs argue that they are entitled to preliminary equitable relief to "place NFI [i]mporters in exactly the same position as every other importer of every other product subject to antidumping and countervailing duty orders – no better, no worse." *Pls.' Post-Hearing Br.* at 54.

Defendant argues that the balance of hardship favors the protection of the revenue of the United States. According to Customs, "the cash deposit requirement does not, and was never intended to, provide protection for all antidumping and countervailing duties." *Def.'s Opp'n* at 24.

The balance of hardships favors the grant of a limited preliminary injunction. If the Amendment and the Clarification remain in effect and continue to be applied by Customs during the pendency of this litigation in the manner in which Customs has applied them thus far, the eight plaintiffs are likely again to be confronted with the obligation to obtain term bonds of substantial size while their obligations under past term bonds continue. Two plaintiffs already have secured additional bonds to secure their 2006-2007 importations and, not surprisingly, both of these plaintiff-importers were required by their sureties to obtain letters of credit from financial institutions collateralizing the full amount of the bonds. There is little doubt that sureties will require that the eight plaintiffs obtain additional letters of credit from their lenders to

post as security for any future term bonds.  Defendant does not assert, and cannot credibly assert,

that the obligations under the bonds will not continue until all entries thereunder are liquidated –

an event which is not imminent.  Defendant raises only the unconvincing argument that

plaintiffs' assertion that sureties will continue to require collateralization for new bonds is

"speculative."  The current level of financial pressures on the eight plaintiffs, as established by

the evidence submitted and those plaintiffs' testimony before the court, can only increase absent

a preliminary injunction directed to preserving generally the *status quo* during the pendency of

this litigation.

Defendant raises an additional argument concerning alleged transhipment of shrimp,

pointing to a "possibility" that certain entries will be assessed antidumping duties at the

countrywide rate for China of 112.8 percent.[7]  *See Def.'s Post-Hearing Br.* at 37.  As to the

alleged transhipment, Bruce W. Ingalls, Chief of the Debt Management Branch in the Revenue

Division of the Office of Finance, testified during the hearing on April 5, 2006, declaring that

> [a]fter initiation of the antidumping cases, [Customs] noted substantial shifts in
> import patterns that suggest transhipment of shrimp to circumvent the high tariffs
> on shrimp.  [Customs] and U.S. Immigration and Customs Enforcement
> representative [*sic*] (ICE) from the Singapore Attaché office visited shrimp
> producers in Indonesia (a country not subjected to antidumping) that appeared to
> be of high-risk for transhipment.
>
> [Customs] confirmed that three producers commingled Chinese shrimp and
> exported the merchandise claimed as Indonesian to circumvent the payment of
> antidumping duties.  Fifty-four importers were sourcing shrimp from the three
> Indonesian producers during the time when Chinese shrimp was commingled.

---

[7] The countrywide rate for China is the rate assessed to those Chinese exporters who were
unable to establish freedom from government control.  It is also, ultimately, the highest rate
assessed during the investigation.

NFI importers represent approximately 50% of the imported volume. . . .
[Customs] has issued CF 29 (Notice of Action) [to notify each importer that
Customs is investigating subject imports pursuant to 19 U.S.C. § 1592 and] to
demand that antidumping deposits be made for these imports. . . .

*Def.'s Opp'n* at *Decl. of Bruce W. Ingalls* ¶¶ 18-20.  Defendant maintains that the new bonds "are

thus the *only* security that the Government possesses with respect to these entries."  *Id.* at 24

(citing *Decl. of Bruce W. Ingalls* ¶ 21).  According to defendant, this prospective harm outweighs

plaintiffs' "hardship," which defendant characterizes as "bear[ing] the risk of their own

nonpayment of duties."  *Id.* at 25.  Defendant also argues that because plaintiffs failed to inform

the court of the proceedings initiated by Customs with respect to such alleged transhipments,

plaintiffs' "claims should be barred by the doctrine of unclean hands."  *Id.* at 27.

The court finds defendant's arguments concerning the alleged transhipment, including the

"unclean hands" argument, unconvincing.  The court cannot draw conclusions relevant to a

preliminary injunction from the investigation under 19 U.S.C. § 1592 to which defendant alludes.

Any such investigation has yet to be completed.  The facts that eventually may emerge from such

an investigation have not yet been found.  In any event, the relevant facts are not before the court.

Defendant has not introduced evidence in this proceeding that would enable the court to make

findings concerning the alleged transhipment and any eventual antidumping duty liability that

could be associated with such findings.  Any inference drawn with respect to an investigation

under 19 U.S.C. § 1592, therefore, would be unsupported by evidence and premature.

Defendant's "unclean hands" argument is unavailing for this same reason.  Moreover, defendant

did not introduce evidence at the court's hearing from which the court could conclude that any of

the eight plaintiffs engaged in wrongdoing.

Customs has failed to establish to any degree of certainty that the future entries of Eastern

Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star

will be assessed upon liquidation any antidumping duties above the cash deposits, or that these

plaintiffs are prone to default on future obligations to pay such duties. The United States,

through the testimony of Mr. Ingalls and the submission of attachments A through E regarding

the possibility of substantially higher final antidumping duty liability, sought to demonstrate the

potential loss of revenue if the injunctive relief is granted. *See Def.'s Opp'n* at *Decl. of Bruce W.*

*Ingalls* ¶¶ 10-15 & Attachs. A-E. Mr. Ingalls, however, conceded that the scenarios presented in

attachment A are hypothetical.[8] Tr. 652. Moreover, the court does not view as probative

Mr. Ingalls's general assertion that the final antidumping duty rates on shrimp are likely to be

higher rather than lower because this conclusory statement was not supported by any record

evidence. Tr. 653-655, 678-680. Therefore, the arguments raised by Customs regarding

potential antidumping duty liabilities and "possible" transhipments of Indonesian and Chinese

shrimp are, necessarily, speculative.

Attachment A indicates that the bonds issued to importers of shrimp prior to the six

subject antidumping duty orders would cover the liabilities arising from a 28 percent increase in

the final antidumping duty rate over the cash deposit rate. *See Def.'s Opp'n* at *Decl. of Bruce W.*

---

[8] Attachment A presents five scenarios by which defendant quantifies the amount of antidumping duties that Customs would be required to collect if it were instructed to liquidate subject entries at a rate 10, 25, 50, 75, or 100 percent higher than the rate at which the cash deposits were collected. *See Def.'s Opp'n* at *Decl. of Bruce W. Ingalls* Attach. A. For example, if $1 million worth of entries were subject to a 10 percent duty rate, the cash deposits would be $100,000. Assuming that those entries were liquidated at a rate that is 50 percent higher than the 10 percent duty rate, Customs, in this example, would be required to collect an additional $50,000 from subject importers. *See id.*; Tr. 626-627.

*Ingalls* ¶ 15 & Attach. A.  The bonds required by Customs after the implementation of the new bond formulas ensured that Customs would recover the liabilities arising from an 85 percent increase in the final antidumping duty rate.  *See id.* ¶ 14 & Attach. A.  During his testimony, Mr. Ingalls was asked to identify a situation where every importer, at the end of an administrative review, defaulted on its obligations to pay antidumping duties.  Mr. Ingalls could not identify such a situation and testified that he "would find it hard to believe that there is any industry or any sector where you could say for certain that 100 percent don't pay their bills."  Tr. 693.

Attachment C also establishes that only five of the eight plaintiffs were consignees of imports from Indonesian shrimp producers that allegedly engaged in the transhipment of Chinese shrimp.  *See Def.'s Opp'n* at *Decl. of Bruce W. Ingalls* Attach. C.  Although the possibility of circumvention was a critical factor in defendant's balance of the hardship argument – *i.e.*, "the specter of harm faced by the Government is very real and acute" – defendant did not distinguish between the three plaintiffs that did not purchase shrimp from subject Indonesian producers and the five that did.  *Def.'s Opp'n* at 24.  A review of Attachment C also reveals that the values of imports for three of the five plaintiffs that purchased shrimp from subject Indonesian producers were grossly disproportionate to the levels of security demanded by Customs in the original notices of insufficiency and in subsequent demands.[9]  Even assuming that all subject entries of

---

[9] [

Indonesian shrimp are assessed the China-wide rate, the bond requirements of Customs far

exceed the security necessary to cover a 112.8 percent final liquidation rate. Customs has already

collected nearly 100 percent security from Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa

Bay, Oriental Foods, Berdex Seafood, and Aqua Star for subject entries made in 2005 through

2006. An agency's action must be reasonable in light of the harm it seeks to redress. *See*

5 U.S.C. § 706(2)(A) (setting forth the "arbitrary, capricious" standard of review that the court is

to apply when reviewing certain agency actions); *cf. Pope v. U.S. Postal Serv.*, 114 F.3d. 1144,

1148 (Fed. Cir. 1997) (stating that an "agency's action should be sustained as long as the penalty

imposed is reasonable"). These facts lend strong support to a finding that Customs did not

evaluate each importer's risk on a case-by-case basis in assessing the amount of additional

security needed to cover the "alleged," yet undetermined, risk posed by the possibility of

transhipments or increased final dumping margins. Plaintiffs have shown, therefore, that the

bond sufficiency determinations likely were not reasonable in light of the situation Customs

sought to redress. When balancing the hardships of the parties, the court finds that plaintiffs will

suffer greater adverse effects than defendant during the pendency of this litigation if Customs is

not enjoined from making additional bond demands according to the Current Bond Formulas,

which will necessitate the further serious depletion of plaintiffs' credit. Moreover, because the

court will fashion the injunctive relief in a manner that will allow defendant to move for a

modification of the injunction to "establish a change in circumstances that would make the

]

original preliminary injunction inequitable," any prospective harm to defendant that later

materializes may be remedied.  *Favia v. Ind. Univ. of Pa.*, 7 F.3d 332, 340 (3d Cir. 1993); *see*

*Aimcor, Ala. Silicon, Inc. v. United States*, 23 CIT 932, 938, 83 F. Supp. 2d 1293, 1299 (1999)

(stating that "courts have inherent power and the discretion to modify injunctions for changed

circumstances" (citing *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961))).

### D.  Public Interest

Even when plaintiffs have "overcome the burden of showing the probability of irreparable

harm and the likelihood of success on the merits, or alternatively, that the parties have presented

serious questions of law and that the balance of the hardships tips in favor of the plaintiff[s], the

court must still protect the public interest." *Associated Dry Goods Corp. v. United States*, 1 CIT

306, 310-11, 515 F. Supp. 775, 779 (1981).  For several reasons, the public interest would be best

served by the issuance of a preliminary injunction that preserves generally the *status quo* with

respect to the bond status of each of the eight plaintiffs that made adequate factual showings of

irreparable harm and precludes enforcement of the "agreements" not to import certain subject

shrimp.

The public interest is not served by administration of a bond policy that plaintiffs likely

will demonstrate to be arbitrary and capricious and, specifically, to be discriminatory with respect

to the shrimp importing industry.  Nor is the public interest served by the continued application

of a regulatory action that plaintiffs are likely to demonstrate is unreasonable and more onerous

than necessary to achieve the statutory purposes of 19 U.S.C. § 1623 and the regulatory

objectives of 19 C.F.R. § 113.  The court recognizes, however, that the public interest is served

by ensuring that any equitable remedy adopted for the pendency of the proceedings allows

Customs to protect the revenue.  Therefore, any injunctive relief must be fashioned in a manner

that would allow for modifications under the appropriate circumstances.

### E.  Scope and Nature of Preliminary Injunctive Relief

Based on plaintiffs' showings of irreparable harm and likelihood of success on the merits,

the court concludes that plaintiffs' amended motion for a preliminary injunction seeks relief that

is overly broad.  As discussed previously, only eight of the 27 plaintiffs have established that,

absent a preliminary injunction, they will suffer irreparable harm.  Accordingly, the court is

ordering preliminary injunctive relief that, at this time, is confined to the bond status of the eight

plaintiffs that made a showing of irreparable harm at the court's hearing.

With respect to the eight plaintiffs, the court's preliminary injunction order is narrower in

scope than that sought by plaintiffs.  Plaintiffs seek an order requiring Customs to allow any

plaintiff to replace any continuous basic importer's bond that was used to enter merchandise on

or after February 23, 2006.  Under plaintiffs' draft order, Customs would be required to allow a

plaintiff to replace such a bond "with a bond calculated without regard to antidumping or

countervailing duties." *Mot. to Amend Injunctive Relief Requested*, attached *Order* at 3.  Were

the court to include such a provision in its preliminary injunction order, that order would restore,

for most plaintiffs, the *status quo ante* rather than maintain the *status quo*.  Such an order would

be broader than the showing of irreparable harm that any plaintiff has made.  Although the eight

plaintiffs have shown that further application of the formulas in the Amendment, the Current

Bond Formulas, and the Clarification will cause them irreparable harm, they have not shown that

the demonstrated irreparable harm is preventable *only* through a new bond with a limit of liability

that is calculated entirely without regard to antidumping duties.  Seeking such broad relief

without a demonstrated factual basis presumes that no other limit of liability would suffice to preclude additional irreparable harm during the pendency of this case.

Plaintiffs' proposed order also exceeds plaintiffs' showing of likelihood of success on the merits.  As discussed previously in this opinion, plaintiffs have shown a likelihood of success of demonstrating that the individual bond determinations for the eight plaintiffs were made in a way that was arbitrary and capricious.  Plaintiffs attempted to, but did not, establish a likelihood of success for their argument that Customs is precluded by 19 U.S.C. § 1623 from any consideration of antidumping duties when setting limits of liability for term bonds.  This is not to suggest that the court rejects plaintiffs' argument, only that the showing they have made to date falls short of a showing of likelihood of success on the merits with respect to that particular issue.  Moreover, an appropriate preliminary injunction considers the balance of hardships and the public interest. The court considers these two factors to be best satisfied by preliminary injunctive relief that is sufficient to avoid the demonstrated irreparable harm during the pendency of the proceeding but that balances the scope of the relief with the government's interest in setting bond limits of liability that are adequate to protect the revenue.

As noted previously, counsel for plaintiffs, in the status report of August 21, 2006, sought a modification to the draft preliminary injunction that the court discussed with the parties at the conference of July 19, 2006.  That modification would direct Customs to permit the parties to obtain a change in the limit of liability in any continuous bond obtained on or after February 23, 2006, to a limit of liability that is not determined according to the Amendment or the Clarification, using the procedures of 19 C.F.R. § 113.23(a)(1) and (d), under which Customs may approve a superseding bond.  Counsel for plaintiffs informed the court in the August 21,

2006 status report that this superseding bond procedure would be intended for only two of the eight plaintiffs who introduced evidence. The evidence introduced by those two plaintiffs thus far, however, does not establish that the limits of liability in the current bonds, even when considered with the continuing liability under previous bonds, are causing the extraordinary level of harm that would require the court to order Customs to approve superseding bonds at this time. However, the preliminary injunction that the court is ordering will permit Eastern Fish and Ore-Cal, and any other plaintiff, to seek a modification of the preliminary injunction based on a demonstration of changed circumstances.

The preliminary injunction that the court will order is necessary to prevent the imminent harm that will result when the current one-year term bonds expire and must be replaced with new term bonds. As noted previously, that process will begin in December 2006 and continue over the next several months. Application of the Current Bond Formulas will add to the cumulative burden on the credit availability of the eight testifying plaintiffs. The letters of credit resulting from the first two rounds of bond sufficiency determinations already burden plaintiff-importers' credit availability, adversely affect their ability to pay, and therefore impede their ability to qualify for what otherwise would be lower bond limits. Some of the bonds issued during the second round of bond determinations contained limits of liability of $1.5 million or higher, and certain of those bonds were for amounts substantially higher than $1.5 million.

As discussed previously, counsel for defendant indicated in a status conference that the bond sufficiency reviews contemplated under the Notice are prospective only, and that Customs did not intend to review bonds currently in use by the eight plaintiffs to determine whether it is appropriate to cancel and replace the current bonds with superseding bonds with lower limits of

liability. Customs stated in the Notice that "[i]f [Customs] determines that the principal has a record of compliance with customs laws and regulations and that the principal has demonstrated an ability to pay, [Customs] may decide not to require an increased bond amount even though the principal imports Special Category merchandise." *Notice*, 71 Fed. Reg. at 62,278. The court notes that the revised position by Customs as announced in the Notice is likely to prejudice some shrimp importers, including certain of the testifying plaintiffs, relative to other shrimp importers. The high limits of liability on bonds currently in place, which resulted from the application of the Current Bond Formulas with little or no discretionary relief from such application, required plaintiffs to incur substantial liability under letters of credit to secure those bonds and thereby adversely affect the plaintiffs' future ability to pay by burdening plaintiffs' credit lines. Consequently, by refusing to reconsider the damaging effects of its previous bond determinations, Customs is perpetuating the harm caused to the affected importers, which harm is likely to become more acute as a result of the impending next round of bond determinations. The court considers the threat of future harm sufficiently serious as to require the court to address it in the preliminary injunction.

The court will order Customs to begin immediately a review of each of the bonds containing limits of liability of $1.5 million or more that currently are in use by any of the eight plaintiffs that testified before the court. Five current bonds fall into this category. The court directs that the review be focused on the question of whether those bonds should be replaced with superseding bonds with lower limits of liability based on the prior record of the principal and on the other factors identified in 19 C.F.R. § 113.13(b). The review must be completed within 60 days of the date of the Order imposing the preliminary injunction, during which period

Customs must report to the court its conclusions and the reasons for its conclusions. Thus, the review must occur concurrently with the earliest of the bond sufficiency determinations that will take place upon the expiration of the term bonds currently in place for the eight testifying plaintiffs. The court requires that Customs allow the affected plaintiffs the opportunity to submit relevant information and to comment during the reviews. The court is limiting the required reviews to the five current bonds with limits of $1.5 million or above because of the exigent circumstances and the need of the court to obtain additional information concerning those five bonds.[10] However, nothing in the preliminary injunction precludes Customs from similarly reviewing other bonds of the testifying plaintiffs or any other plaintiffs, including bonds for which the term has expired or that have been terminated but otherwise remain in effect.

Future bond determinations also have a significant effect on the status of this case. Continuous bonds of two of the eight testifying plaintiffs will expire in December 2006. The court, therefore, is directing counsel for the parties to inform the court of the status of their negotiations on the limits of liability in the two continuous bonds that will be in place following the December 2006 expirations.

Finally, the appropriate preliminary injunctive relief must address the special situation presented by the current bond status of three of the testifying plaintiffs. Each is subject to an agreement not to import shrimp, or certain shrimp, that are subject to antidumping duties. One

---

[10] The statute, under 28 U.S.C. § 2643, provides the court with broad discretion to fashion the appropriate relief. "[T]he court . . . may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision" in cases where "the [court] is unable to determine the correct decision on the basis of the evidence presented." 28 U.S.C. § 2643(b). "[T]he [court] may, in addition to the orders specified in [§§ 2643(a) and (b)], order any other form of relief that is appropriate in a civil action, including, but not limited to, . . . injunctions . . . ." 28 U.S.C. § 2643(c)(1).

plaintiff is subject to an agreement not to import any aquaculture product subject to antidumping duties. The record reveals that plaintiffs are likely to be able to show that these conditions, which are not bond conditions but the result of side agreements in e-mail correspondence, violate the Customs regulations, including, in particular, the 30-day notice requirement of 19 C.F.R. § 113.13(c). Because these agreements appear to have been imposed contrary to the regulation and under a degree of duress, and because the conditions are causing irreparable harm to each of these three plaintiff-importers, as discussed previously, the court considers it inappropriate to allow these conditions to be enforced during the pendency of this proceeding. However, the limits of bond liability for each of these three plaintiffs may or may not be sufficient to allow Customs to protect the revenue should imports of the subject merchandise resume. The preliminary injunction order, therefore, allows Customs to seek a modification of the injunction for changed circumstances. Any change in a limit of liability must be reasonable in view of the circumstances and consistent with the purposes of 19 U.S.C. § 1623 and the guidelines of 19 C.F.R. § 113.13.

### III.  Other Motions

During the cross-examination of Mr. Ingalls, plaintiffs moved to strike two statements. Plaintiffs moved to strike the record of testimony proffered with respect to certain additional Customs notices of action (*i.e.*, "Customs Form 29s" or "CF 29s") that had not been included in the administrative record or submitted to the court by defendant. Plaintiffs argued that any such testimony would be hearsay because Mr. Ingalls testified that he had neither seen nor could confirm the actual existence of additional notices of action. *See* Tr. 638, 697. Plaintiffs further moved to strike, on the basis of hearsay, the portions of testimony proffered by Mr. Ingalls that

relate to the three Indonesian shrimp producers who are said to have admitted to commingling Chinese shrimp. *See* Tr. 635, 708. The court reserved decision on both rulings.

The testimony elicited from Mr. Ingalls relating to the notices of action contained in Attachment D indicates that Mr. Ingalls has personal knowledge that additional notices of action had been issued. *See Def.'s Opp'n* at *Decl. of Bruce W. Ingalls* Attach. D. When asked on direct examination whether Attachment D contained "all of the CF29s that were sent to the various NFI importers," Mr. Ingalls testified "[n]o, [it] is not an exhaustive list." Tr. 638. Upon cross-examination, when asked how he knew that other CF 29s exist, Mr. Ingalls responded "[w]hen we contacted the ports to get copies [of the CF 29s], some of the ports produced them immediately and other ports didn't, so that led me to believe that there are other CF29s out there having been issued. We just didn't get copies [of the other CF 29s]." Tr. 697. Based on Mr. Ingalls's testimony, his statement appears to be based on personal knowledge. Despite plaintiffs' assertion that someone at Customs told Mr. Ingalls that other CF 29s existed, plaintiffs never so established upon the cross-examination of Mr. Ingalls. *See* Tr. 696-705. Rather, Mr. Ingalls's testimony indicates that he believes that other CF 29s exist based on the fact that Customs requested copies of the CF 29s, some of the ports immediately produced copies, and some of the ports did not. Mr. Ingalls could reach such a conclusion based on his personal knowledge of the case. Plaintiffs did not elicit testimony to the contrary. Plaintiffs' objection and motion to strike the testimony as hearsay are overruled.

Mr. Ingalls's statement that three Indonesian shrimp producers admitted to commingling shrimp, however, is an out-of-court statement offered for the truth of the matter asserted. *See* Tr. 635, 708. Upon cross-examination, plaintiffs asked Mr. Ingalls whether he was "directly told

by the Indonesian shrimp producers" as to the information concerning the admissions of commingling. Mr. Ingalls replied, "[d]irectly from the Indonesian – no." Tr. 708. Plaintiffs then asked "[w]as it something you were told by someone else at Customs," to which Mr. Ingalls replied "[y]es." *Id.* The statement is therefore double hearsay: hearsay as stated by the Customs official to Mr. Ingalls and hearsay as stated by Mr. Ingalls before the court. The court is not aware of, and defendant did not point to, an applicable exception that would allow the admission of this hearsay evidence. Defendant's assertion that the admissions by the Indonesian shrimp producers are statements against interest perhaps accounts for the statement by the Indonesian shrimp producers to the Customs official, but it does not allow for the admission of the statement by the Customs official to Mr. Ingalls, as recalled by Mr. Ingalls before the court. *See* Tr. 709. Plaintiff's objection is sustained, and the statement in question is stricken from the record of the hearing transcript.

Finally, the court grants the four additional unopposed motions that remain outstanding: plaintiffs' *Motion to Amend Injunctive Relief Requested*, filed on April 14, 2006 and consented to on May 3, 2006; plaintiffs' *Motion to Re-Open Record of Plaintiffs' Motion for Preliminary Injunction*, filed on May 5, 2006 and consented to on May 31, 2006; defendant's *Consent Motion for an Extension of Time Out of Time to Respond to Plaintiffs' Motion to Supplement the Factual Record*, filed on May 31, 2006 and unopposed by plaintiff; and plaintiffs' *Motion to Re-Open the Record for Plaintiffs' Motion for Preliminary Injunction*, filed on July 31, 2006 and unopposed by defendant.

## IV.  Conclusion

Upon application of the four factors that the court must consider when determining whether to order a preliminary injunction, the court concludes that the factual assertions and arguments advanced by plaintiffs establish that Eastern Fish, Ore-Cal, Red Chamber, IGF, Tampa Bay, Oriental Foods, Berdex Seafood, and Aqua Star have shown that they are entitled to preliminary injunctive relief.  Plaintiffs merit preliminary injunctive relief that imposes restraints and obligations on Customs, but only to the extent required to prevent irreparable harm during the pendency of this proceeding.  These eight plaintiffs have not established their entitlement to a preliminary injunction restoring a form of *status quo ante*, which would require Customs to replace current continuous bonds with new continuous bonds for which liability limits are set without regard to antidumping duty liability.  The remaining 19 NFI importers have failed to establish that they will suffer immediate, irreparable harm absent injunctive relief.  The court will order preliminary injunctive relief accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated:  November 13, 2006
        New York, New York